## Case No. 4,164.

### DUNLAP et al. v. STETSON.

[4 Mason, 349.][1]

Circuit Court, D. Maine. May Term, 1827.

---

[1] [Reported by William P. Mason, Esq.]

Mr. Orr, for plaintiffs.
Mr. Greenleaf, for defendant.

STORY, Circuit Justice. I do not think it necessary to go over the pleadings at large in this case, but shall content myself with an exposition of those facts only, which bear upon the main points suggested at the argument.

The first point raised is, whether the suit itself can be maintained, the defendant being a citizen of Massachusetts, and not resident in Maine, and the subpoena having been served upon him in the state of Massachusetts. The exception has been taken by way of plea to the jurisdiction, and has also been relied on in the answer, and must of course now be disposed of, before we can enter upon the merits. The judiciary act of 1789, c. 20, § 11, has declared, "that no civil suit shall be brought before either of the said courts (of the United States) against an inhabitant of the United States, by any original process, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ." This has always been deemed a personal privilege of the party defendant, introduced for his benefit, and which he is at liberty to waive, and not, strictly speaking, a question of the jurisdiction of the court. But the defendant has chosen, on this occasion, to take the objection in due season; and the question is, whether the present suit is such an original process as is contemplated by the act. I believe, the general, if not the universal, practice has been, to consider bills of injunction upon judgments in the circuit courts of the United States, not as original, but as auxiliary and dependent suits, and properly sustainable in that court which gave the original judgment, and has it completely under its control. The court itself possesses a power over its own judgments by staying execution thereon; and it would be very inconvenient if it did not possess the means of rendering such further redress, as equity and good conscience required. Although a circuit court in another district might act in personam upon the party, and so far grant an equitable relief, the suit could not be effectual to bind the circuit court in which the judgment was rendered. And it is easy to perceive, that many embarrassments, as well to the remedy, as to the title under the judgment, might arise

,from this conflict and separation of jurisdictions. And if the party obtaining the judgment should, in the mean time, become a citizen of the same state, as the other party, there would, in many cases, be an entire failure of all equitable relief, contrary to the plainest principles of justice. Considerations of this sort have, as I am informed, satisfied the minds of some of the most enlightened judges, that the act of congress never was intended to apply to bills for relief upon judgments rendered in the circuit courts. They are deemed to be, not original suits, but branches growing out of the original suits, and dependent upon them, and very much in their nature, like those hearings in equity authorized by our laws, in cases of the confession of forfeiture upon the penalties of bonds, mortgages, and other agreements, with collateral conditions. There has always appeared to me to be great weight in this reasoning; and I should not hesitate to follow it, unless some stubborn authority stood in my way. I know of no such authority. On the contrary, the case of Logan v. Patrick, 5 Cranch. [9 U. S.] 288, if it did not decide the very point, has never been construed, as questioning it. The form of the certificate in the cause was (apparently in answer to the first question put), "that the said circuit court can entertain jurisdiction of the cause."

A second point is, that the present suit is not maintainable, because, since the rendition of the judgment, and before the filing of the bill, the plaintiffs sold and released to one Richard Pike all their right and title to the land in controversy. In fact, the land was originally purchased of Pike by the ancestor of the plaintiffs, from whom they derived their title, under a deed of general warranty. The argument is, that Pike is now the real plaintiff in interest, and being a citizen of Massachusetts, he could not now maintain any bill in equity in the circuit court against the defendant, who is a citizen of the same state. If this be so, there is an extinguishment of all remedy in equity, in respect both to Pike and the present plaintiffs upon the judgment, for there is no state court of chancery, to which the parties can apply. There is another difficulty not adverted to at the argument, and that is founded on the 11th section of the judiciary act of 1789, ch. 20, which provides, that no district or circuit court shall have "cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee, unless such suit might have been prosecuted in such court to recover the said contents, if no assignment had been made, except in cases of foreign bills of exchange." Now, upon the ground assumed by the defendant, the present plaintiffs could not maintain an injunction bill in this district to this judgment; and supposing the conveyance to Pike to operate as an assignment of their rights, the latter also would

be precluded from the same resort. These are inconveniences, which cannot escape the most superficial observation. They furnish no reason for assuming jurisdiction, where it is not given; but they furnish some reason against the extension of general words to cases, which, it is not easy to believe, could have been within the legislative intention.

But it is not necessary to rest this question on any considerations of this nature. The judgment in the writ of entry was a conclusive bar to the title of the plaintiffs, so far as it was of a legal nature. It was a complete recognition of the defendant's right of recovery, and an extinguishment pro tanto of the plaintiffs' title. It was not necessary to perfect the title of the defendant, that he should have been put into possession of the land by a writ of seisin. He might enter into possession without any such execution, for his title was complete by the judgment. So are the authorities recognized by our own courts.[2] This being so, there is no pretence to say, that the deed to Pike did or could convey any legal estate to him against the defendant. It was as little competent to pass any equitable estate in the premises; for in a correct sense the plaintiffs had no such estate. If the plaintiffs are entitled to any redress upon the present bill (and the circumstances therein stated constitute their whole equity), it is most obvious, that it is not because they possess any equitable estate in the land, but because they possess an equitable claim upon the defendant, personally, for relief. This is not the case of an express or implied trust, created or admitted by the parties themselves. It is a naked equity, which is set up upon the ground of a constructive trust created by a court of chancery, because there has been some mistake, or fraud, or accident, or other claim, acting upon the conscience of the party. Until the equity has been established by the decree of a court of equity, it has no positive existence. It is the creature of the court itself.[3] Now, admitting that choses in action, and even possibilities of interest, are in general assignable in equity,[4] it would be difficult to establish, that such a mere naked possibility of equity, as this, is assignable, or would be recognized and enforced in a court of equity in a suit by the assignee. The cases of Jacobson v. Williams, 1 P. Wms. 383, 385, and Spragg v. Binkes, 5 Ves. 583, admonish us, that courts of equity entertain some reserves on this subject; and without a positive authority in its favor, I should feel no inclination to sustain it. Nothing approaching to such an authority can, as far as my researches extend,

[2] Com. Dig. "Execution," A 1; McNeil v. Bright, 4 Mass. 282; Gilbert v. Bell, 15 Mass. 44; Co. Litt. 34b.

[3] Brace v. Duchess of Marlborough, 2 P. Wms. 491; Gilman v. Brown [Case No. 5,441].

[4] Thomas v. Freeman, 2 Vern. 563, and Raithby's notes; Wind v. Jekyl, 1 P. Wms. 572; Higden v. Williamson, 3 P. Wms. 133.

be found.[5] I cannot perceive how the assignee of such a constructive trust, or naked equity, as is here set up, could sustain a bill to enjoin the judgment. And if he could, it would not necessarily follow, that it might not also be maintainable in the name of the plaintiffs for the benefit of the assignee. But the deed to Pike contains no such assignment. It is a mere conveyance and release of all the "right, title, and interest (of the plaintiffs) in and to the lots of land," &c. free from the claims of all persons, claiming by, through, or under them. Now, this naked equity constitutes no right, title, or interest in the land itself. A judgment creditor has a lien on the land of his debtor; but it is neither jus in re, nor jus ad rem; and though he releases all his right to the land, he may afterwards extend his execution upon it.[6] So a release of a right to land does not extinguish a bare authority in an executor to sell it.[7] Both of these cases are much stronger than the present; and to carry the interpretation of the words of the deed to the extent of operating as an assignment of the possible equity of the plaintiff, would be, not to enforce, but to defeat the intention of the parties to it. It would be a much more rational interpretation to construe it (as is contended for by the plaintiff's counsel), as intended to operate as a release or extinguishment of the covenants of warranty of Pike, in his original conveyance to their ancestor. For these reasons, I am of opinion, that this objection is unsustainable.

There is another objection to the bill, which may as well be disposed of in connexion with the preceding. It is, that if the defendant is entitled to any part of the land, the judgment cannot be enjoined; for relief in equity will be granted only, when the fraud goes to the whole of the judgment, and not where it is but of partial application. This objection is founded upon a mistake of the real intent of the authorities, which have been relied on to support it. A court of equity will grant relief to the extent of the injury, which the party seeking the injunction had suffered. If that applies only to part of the land recovered, there is nothing in the principles or practice of the court, which prohibits it from restraining or modifying its relief accordingly.

We may now approach the merits of the case. Both parties claim title under one James Budge, who became entitled, in the manner which will be hereafter stated, to one hundred acres of land in Bangor, of which he sold one acre to one William McGlathry by a deed dated in April, 1798, describing the same by certain metes and bounds. The remaining ninety-nine acres confessedly belong to the defendant, and

Messrs. Lapish and French, in undivided moieties, through intermediate conveyances from Budge. The whole contest between the parties respects the title to this one acre. It is bounded and described, in the deed from Budge to McGlathry thus: "A certain lot of land, lying and being in Bangor, on Condeskeig point, so called, bounded and described as follows, to wit, beginning at a stake on the west bank of Penobscot river, near a thorn bush marked on four sides, running north eleven rods to a stake and stones; thence southerly to a stake and stones, a corner; thence south nine rods to a stake and stones on the same bank of the same river; thence running on the western bank of said river to high-water mark sixteen rods, to the first mentioned bounds, with all the privileges of water and landing to the same belonging." The colonial act of 1641 declares, "that in all creeks, coves, and other places, about and upon salt water, the proprietor of the land adjoining shall have propriety to the low-water mark, where the sea doth not ebb above one hundred rods, and not more, wheresoever it ebbs further." The question is, whether by the terms of the present deed, McGlathry as riparian proprietor took the flats to low-water mark, in front of the land, or whether, as against Budge, and all claiming under him, he is limited to high-water mark on the western bank of Penobscot river. It appears to me very clear, that the deed bounds McGlathry by the western bank of the river at the high-water mark. Assuming Budge to have been an original riparian proprietor, entitled, by the operation of law, to the adjacent flats, it was certainly competent for him to sell the upland and reserve the flats. The only question is, what is the true construction of his deed in this particular. It is to be observed, that it is not a deed bounding the grantee on the river, or the stream of the river, generally, where the flats might pass by implication; but the boundaries are specific and definite. The land conveyed is marked out, by certain stakes and stones, on the west bank of the river; the beginning point is on the same bank near a thorn-bush; and the line along the river runs on the west bank of the river to high-water mark to the first bound. The limitation throughout is by the bank of the river, and with reference to known objects on that bank; and the words, "to high-water mark," can have no other rational meaning, in the connexion in which they stand, than as indicating the front line of the bank itself. The subsequent words, "with all the privileges of water and landing to the same belonging," do not extend the bounds of the land conveyed; but merely secure to it the easements and privileges of water and landing, which may well consist with a reserve of the flats to the grantor. Such, upon principle, is the construction of the deed, to which my mind is irresistibly led. And the authorities

---

[5] See Robinson v. Macdonnell, 5 Maule & S. 228.

[6] Brace v. Duchess of Marlborough, 2 P. Wms. 491.

[7] Co. Litt. 265; Com. Dig. "Release," B 3.

are equally conclusive in its favour. It is only necessary to refer to Storer v. Freeman, 6 Mass. 435; Hatch v. Dwight, 17 Mass. 289; and Hasty v. Johnson, 3 Greenl. 282.

Then, it is suggested, that since the period of the grant, there has been an encroachment upon the bank, by the gradual wear of the stream of the river. If this be so, the grantees under McGlathry must be confined to the line of the bank as it now actually exists. It is like the common case of alluvion, where something is gradually added to land by an imperceptible increase. What is taken from the bank is an imperceptible increment to the flats, and passes to the owner of it, in the same manner, as if there had been a like increment to the bank, it would have passed to the riparian proprietor. He takes the title, subject to those common incidents, which may diminish or increase the extent of his boundaries. This is common learning, laid down in Mr. Justice Blackstone's Commentaries (2 Comm. 261), and has been fully recognized in Adams v. Frothingham, 3 Mass. 363, and very recently acted upon by the king's bench in a case strikingly in point (Stratton v. Brown, 4 Barn. & C. 485). The plaintiffs then must be deemed to be limited in their title to the bank of the river, as it now exists, and have no legal or equitable title to any portion of the front, which now constitutes flats.

But the principal inquiry yet remains to be considered; and that is, whether the plaintiffs have made out any ground whatsoever for equitable relief, so as to entitle them to a decree of the court. To understand the nature of the objections urged against them, it will be necessary to state some of the leading facts, asserted in the pleadings, and established in the proofs. Budge was a settler on the one hundred acres of land before the first day of January, 1784, and continued in possession, until he made conveyances to the parties respectively. The land, however, belonged to the commonwealth of Massachusetts, and consequently, Budge had no legal title to maintain his possession against the government. On the 5th of March, 1801, the legislature of Massachusetts passed a resolve, on the petition of the inhabitants of Bangor, praying for a confirmation of the respective lots, on which they had settled before the 17th of February, 1798. It provided, "that all the settlers in the town of Bangor, or their legal representatives, who actually settled before 1st of January, 1784, be entitled to a deed of their respective lots of one hundred acres each, by paying into the treasury of this commonwealth eight dollars and forty-five cents," &c. It further provided, "that the committee for the sale of eastern lands be, and they hereby are directed to cause the several lots in the town of Bangor to be surveyed and run out by metes and bounds to each of the settlers in said town, agreeably to this resolve, by some faithful surveyor,

&c. and a return thereof to be made to said committee by the first day of November next; and that six months be allowed to each settler, after the return of the surveyor, to pay for their lands, the settlers paying interest, from this date, upon the money for their respective lots." Long before this period, to wit, in 1787, and while he was in possession of his lot, Budge mortgaged the same jointly to Robert Treat and James Ginn. He afterwards, in April, 1794, mortgaged the same to one John Lee, who obtained a judgment for possession of the same in September, 1798, on which execution was issued, and possession taken in January, 1799. In March, 1799, Budge conveyed the same lot to Peck, with the following reserve, "excepting one acre sold to William McGlathry, as by his deed, dated the 19th of April, 1798," and also subject to the mortgage to Lee. Peck, on the same day, as collateral security for the fulfilment of the terms of the sale, re-mortgaged the lot back to Budge. A few days afterwards, Peck sold and released the same lot with the same exception of McGlathry's acre, to one Daniel Wild. In November, 1800, Wild conveyed one moiety of the same lot to Zadock French and Robert Lapish; and in March, 1801, he conveyed the other moiety to the defendant. Each of these deeds also contains the like exception of the one acre of McGlathry. Budge released to Peck the mortgage given to him by the latter, in February, 1801, and in June, of the same year, Ginn released to Budge his right in the mortgage to him and Treat; and afterwards Treat released his share of the mortgage to Peck, and confirmed it in October, 1803. In June, 1801, Lee assigned his mortgage and judgment thereon to Robert Lapish; and in October of the same year, Lapish released to Budge all actions, causes of action, and demands, on account of that mortgage, with a proviso which will be hereafter noticed. In November, 1801, the surveyor, appointed by the commissioners, made a return, that he had "laid out by metes and bounds, conformably to the resolve, to Robert Lapish and others, assignees of James Budge, one hundred acres of land," and proceeded to state the boundaries. In March, 1802, the commissioners made a conveyance, according to law, to Robert Lapish, Amasa Stetson, and Zadock French, "assignees of James Budge, who settled in said town of Bangor, before the 1st of January, 1784," of all the right, title, and interest of the commonwealth in and to the same lot of land. Such is the deraignment of the title of the defendant to the moiety of the lot. It is most manifest, that the deed of the commissioners, in 1802, conveyed to the grantees the whole lot, supposing them to be the assignees of Budge of the whole one hundred acres. It is as manifest, that they never were assignees of the one acre conveyed by Budge to McGlathry, and that the very deeds, under

which they claim, all contain an express exception of that acre, so that they had the most perfect and complete notice, not only, that they had themselves no title to it, but who the party was, that did possess the title.

Under such circumstances, it is natural to inquire, upon what ground the defendant can assert any claim whatsoever, in justice or equity, to the acre of McGlathry. He never become the purchaser of it; it never was assigned to him by Wild; he had full notice of the existence of the title of McGlathry; and his own title to the ninety-nine acres is precisely of the same nature under Budge, as that of the plaintiffs to the one acre. He has, however, with Lapish and French, procured the legal title to the whole lot from the commonwealth, and he has, at law, recovered his moiety of this acre, under that title, against the plaintiffs, who are in possession under the original title of McGlathry. He now contends, that he has a right to hold it discharged of all the equity of the plaintiffs; and that their claim, whatever it was, is utterly extinguished. I was curious to ascertain, how this was to be made out, as a matter of general justice, and listened at the argument for some explanation of the merits of such an assertion of right. None was offered; and therefore it stands drily upon the naked point of superiority of legal title; and it must, if maintainable at all, prevail on this account and on no other. Let us then proceed to the consideration of the objections raised to defeat the relief, under this aspect of the case.

The defendant and Lapish and French have, it is true, obtained from the commonwealth the legal title to the whole lot. And much was suggested at the argument, of the sacredness of titles derived from the commonwealth, and of the danger of disturbing them. This court is not insensible of the value of such titles; and has never felt the slightest inclination to bring them into jeopardy. This suit involves no consideration of that sort. The question here is not, whether the commonwealth had, or did convey, a title, perfect at law, but whether that title has gone to the proper object of its bounty. Would it be pretended, that if a man should fraudulently procure from the commonwealth a title to lands, intended for another, either by its bounty or its contract, by misrepresenting himself to be that person, or his assignee, that he should possess the land, thus procured by his fraud or misrepresentation, free of all claims of the injured party? That because his deception had been complete, therefore it should constitute and perpetuate an unimpeachable title? A court of law would not hesitate to set aside such a conveyance. No conveyance is so sacred, that, if infected by fraud, it may not be overturned. And in a court of equity, whose very institution is to enforce good faith and honest dealing, it would not admit of a moment's doubt,

that the court would betray its duty, if it did not repudiate such a transaction; if it did not look behind the form, and arrive at the substance. I do not mean to insinuate, that the present is such a case. I am very far from thinking so; and I should be sorry indeed to be obliged to decree relief against the defendant upon such an obnoxious ground. But how was the title obtained from the commonwealth for the whole lot? It was upon the express suggestion, that the defendant and his co-grantees were the assignees of Budge of the whole title. So the surveyor's return states it; so also the deed to them of the commissioners. It is a conveyance to them as assignees of Budge, and in no other character. Budge was the original object of the bounty of the commonwealth, as a settler in Bangor; and by the resolve of 1801, he and his representatives only, were entitled to the bounty of the 100 acre lot. The commissioners had no right to convey to the defendant and Lapish and French, but as the representatives of Budge in the character of assignees. If they conveyed the whole lot to them, it was because it was understood, that they were the assignees of the whole. It was of no consequence, whether McGlathry was a settler or not, any more than whether the defendant was a settler or not. The title turned solely upon Budge's being a settler, and upon the validity and sufficiency of the assignment of his right to others. How, then, has it happened, that the conveyance of the commissioners has, against the express legislative intention, as to this one acre, been made, not to Budge, or his assignee, but to persons, who now are admitted never to have been assignees, and who had full knowledge of the fact of their total want of title, at the very time of the conveyance? It must be either, because there has been some fraud or mistake, or an implied trust for the real assignee. In either case, the power of a court of equity to administer relief is, in my judgment, incontrovertible. These are the very classes of cases, in which its jurisdiction is ordinarily, and most beneficially exercised. I have already said, that, in my judgment, fraud ought not, in this transaction, to be imputed to the defendant and his co-grantees. It would, in any case, be a harsh supposition, where the circumstances did not necessarily lead to it. The whole of this transaction is perfectly explicable upon other grounds. The defendant and Lapish and French were the real owners of ninety-nine out of the one hundred acres, and legally represented it. The commissioners, either by mistake supposed them assignees of the whole, or, knowing the facts, and willing to execute the authority confided to them by the legislature, conveyed the whole to them with an implied trust, that they would convey to McGlathry his share, or extinguish his right. The grantees could have no objection to such a course; for they could not insist upon separate titles to

their portions of the land, and might be delayed, by the outstanding title of McGlathry, from receiving their deed. When they received the conveyance from the commissioners they must have known the mistake, if it was one; or they must have taken the conveyance upon the implied trust, that they would hold the one acre for McGlathry's benefit. In no other way can their conduct be reconcilable with good faith; for if they represented themselves as the sole owners; or, knowing the mistake of the commissioners, if they took the deed, intending to defraud McGlathry, the transaction, both at law and in equity, would be pronounced void for the fraud, and the deed be set aside on that account, as well against McGlathry and his assignees, as against the commonwealth. Under such circumstances the defence might have been set up in a writ of entry, or other action, touching the realty, as well as in a court of equity; for it would go to the validity of the whole conveyance. It would prove it bad in its origin. But the view, which is taken by myself, of this part of the cause, is, that it presents, not a case of fraud, but a clear case of mistake, or of implied trust; and either way it is within the acknowledged jurisdiction of a court of equity.

It is further objected, that the bill is brought more than twenty years after the deed was given by the commissioners, and that it is now, upon general principles, too late to institute such a suit. If there had been an uninterrupted possession by the defendant and his co-grantees, of the land during all this period, there would have been great force in the argument, from lapse of time, against entertaining an original suit. But, here, there is no pretence of any such possession. On the contrary, McGlathry and his assignees have had an actual or constructive possession of the land during a considerable portion of this period; and the judgment, against which relief is now sought, was the first disturbance of the plaintiffs' right of possession. While the plaintiffs were left in possession of the land, they might well repose upon their equitable title; and the injunction now prayed for, is the result of a necessity imposed upon them by the procurement of that judgment. The circumstance of there not having been an ouster during all the intermediate period, is not insignificant in expounding the defendant's own opinion of the nature of his own title to the land.

It is further objected, that, under the resolve of 1801, no person could be entitled to claim as a settler, or as the representative of a settler, unless the possession was continued down to the time of the passage of that resolve. That this resolve has a tacit reference to the resolve of 28th of June, 1789, where the legislature has defined, who shall be deemed settlers, entitled to relief on the cases therein provided for; and that by the terms of the latter resolve settlers are to be construed to be such persons only, as, before the 1st of January, 1784, went on some tract or lot of land, for the purpose of clearing and cultivating the same, and making it the place of their settled abode, and actually resided on such lot by themselves, or some person under them, before the said time, and cleared, fit for mowing and tillage, at least one acre of land, and built a dwelling house thereon, and still continue to reside on the same. Looking to the other provisions of this resolve, and the provisions of the resolve of 1801, I confess that my own opinion distinctly is, that they have no common object or connexion. The resolve of 1801, gives the bounty to all the settlers in the town of Bangor, or their legal representatives, who actually settled before the 1st of January, 1784, without annexing any qualifications or limitations, like those inserted in the resolve of 1789. The object was, a special relief to the inhabitants of a particular town, upon their petition; and there is not the slightest reference, in the resolve, to any antecedent resolve. It seems to me a very strained construction to incorporate, by implication, the provisions of the resolve of 1789, into this resolve, when there is no necessary connexion between them, and no reference, which leads the mind from the one to the other. If the case turned upon this consideration, I should feel very great difficulty in adopting such a construction. I am aware, that in Lambert v. Carr, 9 Mass. 185, there is an expression in the opinion of the court, delivered by Mr. Justice Sewall, which lends countenance to it. With all my unaffected respect for that able judge, the dictum seems to me wholly uncalled for by the case, and not to have been sufficiently considered. I agree with that decision, that the legislature did not intend, that any person should take, under the resolve of 1801, except those who were settlers, and whose settlements had not been abandoned, but had been continued down, by themselves or their legal representatives. This appears to me a just exposition of the language of the resolve of 1801, standing wholly by itself. A settlement, which had been abandoned, and under which no person claimed a continuing, derivative title, could not have been an object of the legislative bounty. The facts of that case distinctly showed, that Smart's settlement had been abandoned many years before. But, whether this point were correctly decided or not, is, in my view of the present case, not material. The question, here, is not, as there, who were original settlers, entitled to the legislative bounty. Neither McGlathry, nor the defendant and his co-grantees could pretend to be such settlers. Their whole claim is derivative from Budge, as an original settler, and any other title would be repugnant to the whole facts of the case. The acts and proceedings of the commissioners are conclusive on this point.

They decided, that Budge was an original settler, entitled to the bounty, and incidentally, of course, that his settlement was so preserved as to be deemed a continuing settlement down to the passage of the resolve. If a settlement for any part of the land, it was for the whole lot, for his title was recognised for the whole; and whether that possession was personal, or by his assignees, is wholly immaterial now, because the decision of the commissioners is conclusive, upon the state of his title. The assignees of Budge cannot now gainsay such possession or title; and they are estopped from disputing it. If McGlathry or Lapish had a possession, actual or constructive, of any part, it enured for the benefit of the whole lot. I can perceive no evidence of abandonment of their claim to the one acre, either by Budge or McGlathry, or his grantees. On the contrary, the possession has been upheld, through all the intermediate grantees, upon this title alone. But it is said, that the decision of the commissioners was conclusive upon all parties. But of what was it conclusive? I agree, that they had the sole right to ascertain who were the original settlers, entitled to the bounty lots; and to ascertain the boundaries of those lots. Their deeds were conclusive on these points. But I cannot admit, that their authority was conclusive as to who were the legal representatives of any particular settler. Least of all, can I admit, that they had a right to convey the whole to any persons, who were confessedly the grantees or representatives of a part only. They might be deceived, or they might mistake the state of the facts; but any adjudication of the whole, to persons entitled to but a part, would be an excess of their jurisdiction, and however it might be binding between the commonwealth and the grantees of the lot named in the deed, could not bind the equitable rights of third persons, as to those grantees. The cases of Lambert v. Carr, 9 Mass. 185, and Harlow v. French, Id. 192, do not impugn this doctrine. There was no question in either of these cases, whether either party was the true representative of an original settler. The rights set up were conflicting rights under adverse settlers. The like answer applies to the case of Bussey v. Luce, 2 Greenl. 367. It would be so manifestly unjust, that any person should derive a title by his own wrong, or by mistake, to the whole land, when he had purchased with an exception of a part, and could pretend no right to that part, that nothing but the clearest authority would lead me to affirm such a principle. I know of no such authority. On the contrary, I consider the doctrine in Wilson v. Mason, 1 Cranch [5 U. S.] 45, 100, strictly applicable. "He who acquires a legal title," say the court, "having notice of a prior equity of another, becomes a trustee for that other to the extent of his equity." No man can doubt the equity of McGlathry and his assignees to the one acre, under the resolve of 1801; and the defendant had the fullest notice of it. There is also another salutary principle in equity, of which Lord Redesdale has taken notice in Bateman v. Willoe, 1 Sch. & L. 201, 205, that where a party has possessed himself improperly of something, by means of which he has an unconscientious advantage at law, equity will either put it out of the way or restrain him from using it. Under one aspect of the present case, there might have been difficulty in escaping from the proper application of this jurisdiction.

It is further objected, that the plaintiffs are not entitled to relief, because the defendant and Lapish and French are the owners of the legal title to the one acre under the mortgages of Budge to Treat and Ginn in 1787, and Budge to Lee in 1794, which the defendant asserts to be still subsisting mortgages, of which they are the assignees, and he has a right in equity to set them up against the plaintiffs. Now, it is perfectly clear, that, as the conveyance by Budge to McGlathry of this one acre was with covenants against incumbrances and of general warranty, McGlathry or his grantees are entitled to be relieved, as against Budge, from both of these mortgages. When Budge conveyed the one hundred acre lot in March, 1799, to Peck, it was with an express exception of the acre conveyed to McGlathry and subject to Lee's mortgage. It appears from William Hammond's testimony, that it was a part of the contract of sale, that Peck should discharge those mortgages; and, indeed, as to Lee's, this is apparent from the very face of the conveyance by Budge to Peck. The defendant and Lapish and French, were perfectly conusant of Peck's title, and there is no pretence to say, that they have any better right than Peck would have. Nor does the answer of the defendant set up any superior equity or title in the defendant. It stands upon Peck's title in respect to these mortgages. What then is the state of the facts on this point? In June, 1801, Lee assigned his mortgage and judgment to Lapish; and afterwards, in October of the same year, Lapish made the release of the same mortgage to Budge, which has been already alluded to. This release purports, in consideration of five dollars, to release "all actions, causes of action, and demands, for or upon account of a certain mortgage deed, made by said Budge to John Lee, of a certain tract, &c. which said mortgage deed was afterwards, by said Lee, duly assigned to me, said Lapish." Then comes this proviso: "Provided, however, that this release shall not be considered as in anywise affecting any right or title, which is or may be claimed by me or any other person by any other deed from or under said Budge, the true purpose and intent hereof being to secure to those who claim the premises under John Peck a good title to the same." It appears

to me, that the real object of this proviso is incapable of being misunderstood. It is merely to operate as an extinguishment, in favor of Budge, of the very mortgage which Peck was bound to discharge under the conveyance to him by Budge, and which equitably devolved upon Peck's grantees. The proviso is designed to protect these grantees from any implication of an intention to release their title to the premises derived under Peck. What were these premises? Not the whole one hundred acres; but the whole, excepting McGlathry's acre. The release, therefore, was an execution of the original contract of Peck, and extinguished the mortgage in favor of Budge, as well to the acre of McGlathry as to the residue conveyed to Peck; and thus relieved Budge from his warranty to McGlathry. Lapish has the full security intended by the release in the extinguishment of the mortgage, as to the premises derived from Peck; and it would be a violation of justice to revive an extinct mortgage to the prejudice of the parties, who, in the contemplation both of Peck and Budge, were to be relieved from it.

The case is, if possible, still plainer as to the mortgage of Ginn and Treat. In June, 1801, Ginn, in consideration of five dollars, released his title to the whole lot to Budge; and in October, 1803, Treat also, for the consideration of five shillings, released his title in the mortgage to Peck. The very instruments themselves demonstrate the intention of all the parties, that these mortgages should be extinguished; and are consistent only with the supposition, that the extinguishment of them by Peck or his grantees constituted a part of the original contract between him and Budge on the original sale. The consideration of the conveyances by Lapish to Budge, and Ginn to Budge, and Treat to Peck, are all merely nominal, and indicate, in the most unequivocal manner, that the parties considered them as securities, that were to be deemed extinguished as foundations of right or title against Budge or his grantees. To revive them would, in my judgment, be a total departure, as well from the principles of law as of equity. It would be gross injustice to the plaintiffs. There is this additional circumstance, which is decisive against the defendant's right to put forth this defence, that he has shown no title to any part of the premises derived under Lapish, or under the assignment of the mortgage of Lee to him, or under the release of Ginn to Budge, or of Treat to Peck. His title to the premises is independent of all these transactions, and he is in no just sense a privy in the estate under them. It may also be observed, that until the release in 1801, Budge was, by virtue of the mortgage of Peck to him in 1799, so far as respects Peck's grantees, the conditional owner of the whole lot.

It is further objected, that McGlathry's conveyance from Budge was a fraud upon the latter, and ought not now to be upheld as a foundation of title. If this objection were well founded in point of fact, it would not avail the defendant. He has derived no title to the one acre by grant from Budge; and it is very clear, that in a case of this sort none, but a party or privy in estate, could set up a fraud upon the grantor, as the origin of an adverse title. But the evidence of the asserted fraud is too loose and unsatisfactory to be relied on for a moment. And the supposition of its existence is negatived, in the strongest manner, by the subsequent conveyances and conduct of Budge. It is to the last degree improbable, that, if the deed to McGlathry had been fraudulent, Budge would have recognized it in the subsequent deed to Peck; or that he and his heirs would have acquiesced in it, without any serious struggle, up to the present time.

These are the principal points, upon which I deem it necessary to make any observations. There are some other suggestions, which, it is only necessary to say, have not escaped the attention of the court; but they do not seem to me to require any minute answer.

My judgment accordingly is, that as to all the land included in McGlathry's deed, which extends only to the present bank of the river, the plaintiffs are entitled to relief, and the defendant ought to be perpetually enjoined from claiming any title thereto; and as to all the rest of the land recovered by the judgment, the defendant is entitled to a writ of seisin. But this decree ought to be upon the terms, that the plaintiffs shall pay to the defendant all equitable charges, which he has upon the land of the plaintiffs, for expenses, for purchase money paid to the commonwealth, or taxes or other charges, with interest, to be ascertained by a master, in case either party shall request it. The district judge concurs in this opinion, and therefore a decree is to be entered accordingly. Decree for plaintiffs.

