## LAPISH vs. WELLS.

*B*, a "settler" on lands of the Commonwealth of Massachusetts in *Bangor*, within the terms of the two Resolves of *June* 25, 1789, sold one acre of his possession, by metes and bounds, to *McG* ; and afterwards sold the residue of his lot, excepting the acre, to *P*, from whom it passed to *L*, and his associates; who subsequently received from the committee on Eastern lands a deed of the whole lot, as the assignees of *B*, without any exception of the acre; they having complied with the conditions of the Resolve of *Feb.* 5, 1800, relating to settlers in *Bangor*. *L.* resided on the lot ever after his purchase. *McG.* always resided in another town ; and never occupied the acre, nor took any measures to confirm his title, nor exercised ownership over it, till after the Commonwealth, by its committee, had granted it to *L.* and others. In an action by *L.* against a grantee of *McG.* to recover part of this acre, it was *held*,—

That it was competent for the tenant to impeach the deed from the Commonwealth to *L.* and others on the ground of fraud, so far as related to its conveying the acre to the grantees :—

That *McG.* was entitled to be confirmed in his right to the acre, as the assignee and legal representative of a settler, within the meaning of the resolves :—

That a grant by *Massachusetts*, of lands in this State previous to the separation, is impeachable for fraud, in the courts of this State ; notwithstanding the general language of the 7th of the terms and conditions of the act separating Maine from Massachusetts, confirming all the grants of the parent Commonwealth :—

That if the committee on Eastern lands accidentally omitted to except the acre sold to *McG.* from their deed to *L.* and others, and the latter, perceiving the mistake, took the deed in silence, intending to defraud *McG.* of the acre ; the deed, as to that acre, was void.

It is the duty of a judge, when requested, to instruct the jury upon every point pertinent to the issue.

Whether the " grants," &c. mentioned in the 7th of the terms and conditions of the act separating Maine from Massachusetts, can be extended beyond the immediate acts of the legislature, so as to include lands conveyed by the deeds of the committee on Eastern lands,—*dubitatur*.

THIS was a writ of entry, in which the demandant counted on his own seisin of a parcel of land in *Bangor* ; and a disseisin by one *William McGlathry*, under whom the tenant claimed title ; and it came before the court upon exceptions taken to the decisions of *Weston J.* before whom it was tried.

The demandant, at the trial, relied on a deed from the committee

for the sale of eastern lands, appointed by the Commonwealth of Massachusetts, dated *March* 2, 1802 ; conveying to himself, and *Zadock French*, and *Amasa Stetson*, " assignees of *James Budge*, who settled in *Bangor* prior to *Jan.* 1, 1784, the lot *No.* 11, in *Bangor*, as it was surveyed by *Park Holland*, in the year 1801 ;" and further describing it by metes and bounds, including the demanded premises, and extending to low-water mark.

The tenant adduced a deed from *James Budge* to *William Mc-Glathry*, dated *April* 19, 1798, conveying an acre of land, of which the land defended was a part ; bounded " beginning at a stake on the west bank of *Penobscot* river, near a thorn-bush marked on four sides ; running north eleven rods to a stake and stones ; thence southerly to a stake and stones, a corner ; thence south nine rods to a stake and stones on the same bank of the same river ; thence running on the western bank of said river, to high-water mark, sixteen rods to the first mentioned bounds ; with all the privileges of water and landing to the same belonging." This deed was recorded *May* 7, 1798.

He also read a deed from *Budge* to *John Peck*, dated *March* 13, and recorded *March* 20, 1799, conveying a tract of land in *Bangor* known by the name of *Budge's* farm ; bounded " beginning on the east corner of *Penobscot* river ; from thence running north one mile, adjoining the land formerly owned by *Francis Rogers*, deceased ; thence west fifty rods on the land belonging to the Commonwealth ; thence south to *Kenduskeag* stream, on the land owned by one *Harlow* ; from thence down the *Kenduskeag* stream to *Penobscot* river ; and from thence up the said *Penobscot* river to the place of beginning ; meaning to contain one hundred acres ; excepting one acre sold to *William McGlathry*, as by his deed dated *April* 19, 1798," &c.

He also read a deed of the same land from *Peck* to *Daniel Wilde*, dated *March* 23, and recorded *April* 2, 1799 ; and another from *Wilde* to *Zadock French* and *Robert Lapish*, the demandant, dated *Nov.* 21, and recorded *Dec.* 15, 1800, conveying an undivided moiety thereof ; both deeds containing the same description and exception.

It was further proved by the tenant, that at a legal meeting of the

inhabitants of *Bangor,* holden *Dec.* 30, 1800, *Lapish* was chosen to be "their agent to carry in their claims to the government of Massachusetts, and procure deeds for them as settlers in said town;" that in *Oct.* 1800, the *Budge*-lot was surveyed by *Moses Hodsdon* for *Lapish;* who, while they were making the survey, observed that the value of the lot was much less, by reason of the acre sold to *McGlathry;*—That *McGlathry* resided in *Frankfort,* and was never an inhabitant of *Bangor;*—and that the acre sold to him, lay in common with the rest of the land at *Kenduskeag*-point, until a part of it was occupied and fenced, and a house built upon it in 1803, by *Luke Wilder,* who bought a quarter of the acre of *McGlathry* in 1802; which was the earliest actual occupancy of any part of the acre.

The tenant also proved by *Oliver Leonard* Esq. who wrote the deed from *Budge* to *McGlathry,* that the latter had sued *Budge,* and attached his cattle; that *Budge* employed the witness to procure for him a settlement of their accounts and dealings, which were of long standing; that *McGlathry* met him, by appointment, at the house of *Budge,* where each party produced his demands against the other, and a balance was struck of about a hundred dollars, for which *McGlathry* agreed to receive the acre of land, which was measured and conveyed to him on the same day; that this was a settlement of all demands between them; upon which *McGlathry* promised to stop the suit; that the witness was the attorney of *Budge,* and attended the court to which the writ was returnable, and looked for the action, with a view to answer for the defendant, but was unable to find it.

On the part of the tenant was also shown the resolve of *March* 5, 1801, passed on the petition of the inhabitants of *Bangor,* and procured by the solicitation of *Lapish* as their agent, granting lots of one hundred acres each to all who were actual settlers prior to *Jan.* 1, 1784, on payment of eight dollars and forty five cents; and to all who were actual settlers between that day and Feb. 17, 1798, similar lots, on payment of one hundred dollars each; with the expenses of survey in both cases; and directing a survey to be made and returned to the committee on Eastern lands, on or before

23

*Nov.* 1, 1801; after which time six months were allowed to the settlers to pay for their lands.

Under this resolve a survey was made by *Park Holland,* and returned *Nov.* 30, 1801; in which he certified that he had laid out, by metes and bounds, " to *Robert Lapish* and others, assignees of *James Budge,*" one hundred acres of land in *Bangor,* being the lot *No.* 11, on his plan, bounded " beginning at a stump with stones about it, standing on the bank of the river, being the southwest corner of lot *No.* 12; and from thence north seven degrees west, sixty rods, to a pine stump marked; thence north, two hundred and thirty one rods, to a stake marked; thence west, fifty seven rods, to a fir tree marked; thence south, about two hundred and twenty-seven rods, to a stake standing in the county road, one rod east of an oak stump in said road; thence west, four rods, to the stream; thence on said stream, on the bank thereof, and on the bank of the *Penobscot* river, to the first bounds."

It also appeared that a dispute respecting the bounds of their adjoining lots had arisen between *Lapish* and one *Harlow*; which had been referred to the decision of arbitrators; whose award, dated *Jan.* 14, 1802, set forth the boundaries of *Lapish's* lot, describing it as containing one hundred acres, " except one acre sold to *Wm. McGlathry,*" and it was proved that *Lapish,* though requested, did not produce any title-deeds to the referees; alleging that they were lost or mislaid; and that copies of them were afterwards obtained from the record and exhibited by *Harlow.*

It was further proved, in the defence, that the acre was called " the *McGlathry* acre" in 1801; that in *February* of that year *Lapish* offered *McGlathry* eight hundred dollars for it; that in 1805 he said he did not pretend to claim it; that in the same year he and *Amasa Stetson,* Esq. who owned half the *Budge*-lot, said to *Wilder* that their deed covered the acre as well as the rest of the lot, and that they did not see why they could not hold that also; but on *Wilder's* replying that it was not right to take away the land, Mr. *Stetson* answered, in presence of *Lapish,* that though their deed covered that lot, yet they had no moral right to it. *Stetson* and *Lapish,* having previously caused *Kenduskeag* point to be surveyed

into streets and lots, which they had extended across the acre without reference to its lines, asked *Wilder* if he intended to conform to their plan of the streets and lots; to which he replied in the affirmative. And a part of his lot extending a few feet across one of their streets, they wished him to sell them that strip; to which he assented, for an agreed price; and had no doubt he gave them a deed of conveyance. *Wilder* also testified that the owners of the land at the point were very desirous that people should build and occupy there; that before he purchased, he told *Lapish* he thought he should buy of *McGlathry*; and that when he was laying down the sills of his house, *Lapish* pointed out the place which would conform to their plan of the streets, assisted at the raising of the frame, and permitted the people at work under him, as surveyor of highways, to leave their work and assist also.

On this evidence the tenant contended that the deed under which the demandant claimed the acre, and so far as it purported to include it, was obtained from the committee by fraud, and was therefore void, as to that parcel.

The demandant, to rebut this evidence, read copies of certain documents from the land-office; from which it appeared that the existence of *McGlathry's* claim, and of the exception of it in the deeds of the *Budge*-lot, must have been known to the committee at the time of executing the deed of *March* 2, 1802; those deeds, with other papers relating to some disputes respecting the bounds of the lot, having been laid by them before the late Chief Justice *Parsons*, then at the bar, for his advice whether the demandant and his associates were entitled to a deed as the representatives of *Budge*; which he answered in the affirmative. The effect of this evidence was denied by the tenant, who contended that it ought to be rejected.

Two resolves, passed *June* 25, 1789, were also read, restricting the term " settler" to one who made a separate improvement on his lot, fitted for mowing, pasturage or tillage, with an intent to abide and remain thereon; and was resident on such lot, by himself or some other person under him, during the period mentioned in the resolves. Also, the resolve of *Feb.* 23, 1798, directing the resurvey of the *Waldo* claim; and the resolve of *Feb.* 5, 1800, on

the report of *Thomas Davis*, surveyor ; to show that the persons to be quieted in their possessions in *Bangor*, were none but the actual residents mentioned in the preceding resolves.

The demandant also produced a copy of a judgment recovered by *McGlathry* against *Budge* at *May* term, 1798, on default, for one hundred and six dollars damages, with costs, in an action of *assumpsit* ; and a certificate thereon, showing that execution was issued *Nov.* 21, 1798 ; but it did not appear that any part of the judgment had been satisfied.

He further proved by *Holland*, the surveyor, that advertisements of his intended survey of the settlers' lots were posted up in the taverns in the vicinity, six weeks before the time of the meeting ; which was also published in the newspaper printed at *Hampden*, adjoining both *Bangor* and *Frankfort* ; that the settlers generally attended at the survey ; and after it was completed, Maj. *Neal*, who had attended as the agent of Gen. *Knox*, certified his assent to the assignment of the lots to the settlers ; but during all this time there was no appearance, nor any claim, either by *McGlathry* or any one in his behalf ; nor did it appear that he had any personal knowledge of any of these transactions, other than might be inferred from the foregoing testimony. But *Lapish* always had resided on the *Budge-*lot, not far from the acre, from the time of his purchase from *Budge*, till long after the deed was made to him and his associates by the committee, in 1802.

Other evidence was offered by the demandant, showing that the acre lay in common, and was occupied indiscriminately with the rest of the point, by transient occupants and others, up to the year 1805 ; except the separate inclosure of *Wilder's* lot in 1803, as before stated. *Holland* further testified that he did not recollect having any knowledge of *McGlathry's* claim till long after the survey ; but thought he must have had some evidence of the deeds, and of the title of the demandant and his associates to hold as the assignees of *Budge*, or he should not so have returned their names. And he said that had *Lapish* pointed out the acre to him, requesting him to mark it on the plan, he should have marked it.

After the tenant purchased the land defended, it continued in the

occupancy of him and his grantees, till the commencement of this action.

Hereupon it was contended on the part of the demandant, that by force of the resolves referred to, all the lands in *Bangor* were conveyed to Gen. *Knox* and others, interested in the *Waldo* claim, except one hundred acres to each settler then occupying the same; and that as *McGlathry* was not a settler, and never occupied any land in *Bangor*, he could have no right or claim under the resolve of 1801, and was not entitled to any grant or deed from the committee :—

And that as *McGlathry* did not attend before the surveyor, and preferred no claim to him or to the committee, either as a settler or the legal representative of one; and wholly omitted the condition required by the resolve, of paying for the survey, and paying money into the treasury of the State; he had no right to claim any land either as a settler, or as the representative of a settler.

But these points the judge overruled. And he instructed the jury that if the committee had before them the evidence of *Mc-Glathry's* title to the acre under *Budge*, but it escaped their attention, and therefore was not noticed in their deed to *Lapish* and others; and if *Lapish*, when he took the deed, then perceived, though for the first time, that the acre was not excepted; and took the deed with intent to defraud *McGlathry*, to deprive him of the acre, and to hold it against him; this would vitiate the deed as to that acre, and so far render it void;—and that if the deed was so received, with such intent, it was a fraud, not only on *McGlathry*, but on *Budge*, his warrantor of the acre.

It was further contended by the demandant, that if the committee, at the time of giving their deed, were deceived as to the right of *French, Lapish* and *Stetson* to the whole lot; yet the present tenant could not take advantage of this, nor impeach the deed for this cause. But this point the judge overruled.

It was also contended by the demandant, that by the statute of Massachusetts for the separation of Maine, incorporated into our constitution, the grant from Massachusetts to the demandant was

confirmed, so that neither the State of Maine, nor any of its tribu-- nals, could now invalidate or set it aside.    But the judge instructed the jury that if the deed was originally obtained by fraud, it was competent for a judicial tribunal in Maine to declare the grant void ; in the same manner as such a tribunal in Massachusetts might have done before the separation of the State.

The demandant also requested the judge to instruct the jury, that if the committee perceived the exception of the acre sold to *McGlathry*, as stated in the deeds from *Budge*, down to *Lapish* and his associates ; but considered *McGlathry* as not entitled to any land under the resolve, and intentionally excluded him ; meaning to convey the whole lot to *Lapish* and his co-tenants ; it was not a fraud in the latter to receive such a deed.

But the judge declined so to instruct them ; saying that such a course, on the part of the committee, was not to be presumed.

And a verdict was returned for the tenant, as to so much of the demanded premises as lies above high water mark, and within the limits of that part of the acre by him defended.    Whereupon the demandant filed exceptions, under the statute, to the opinions and decisions of the judge, above stated.

*McGaw*, *Greenleaf* and *Sprague*, for the demandant, maintained the following propositions.

1. The entry of *Budge* on the land of Massachusetts, was without pretence of right ; and was not even a disseisin ; because the State cannot be disseised.    He therefore had nothing which he could convey to *McGlathry*.    The latter was not a " settler," within the terms of the resolves referred to ;—*Lambert v. Carr*, 9 *Mass.* 190 ; *Harlow v. French*, *ib.*   192 ;   and so was not entitled to any of the bounty granted by the Commonwealth to that class of persons.    Nor was it any longer in the power of the Commonwealth to grant him the land ; because all the township, not in the hands of actual settlers, was already granted to Gen. *Knox* ; which the grantor could not control.    *Dartmouth College v. Woodward*, 4 *Wheat.* 518.    Yet to the grant to *Lapish*, *Knox* had assented, by the presence of his agent at the survey.   *Bussey v. Luce*, 2 *Greenl.* 367.

Neither was *McGlathry* the " legal representative" of a settler,

though such are mentioned in the resolve of 1801. That term applies only to executors, administrators and heirs; to whom his estate would be distributed, by the statute; not to assignees in fact. But *Lapish* was an actual settler, within the letter and spirit of the resolve.

2. But if *McGlathry* was within the meaning of the resolve, yet he never complied with its terms; and so was not entitled to any land. He did not reside in the town; he claimed nothing; he paid nothing; and if he ever had actual possession, he had long since abandoned it; had prosecuted his suit against *Budge*; and obtained judgment for the very sum agreed to be extinguished by the conveyance of the acre. He was not a tenant in common of any portion of the lot; but had a deed of an acre in severalty. He therefore could, in no view of the case, be entitled to a deed; because the committee could only convey in lots of a hundred acres; and to resident settlers, such as was the demandant.

3. Though the acre conveyed to *McGlathry* escaped the attention of the committee, and *Lapish*, perceiving it, took the deed in silence, yet this was no fraud in him; unless he had taken some measures to deprive *McGlathry* of that to which he was entitled. The mere suppression of a fact within his own knowledge, is no fraud. *Laidlaw v. Organ*, 2 *Wheat.* 178. Nor was he bound by any notice respecting the claim of *McGlathry*, the latter having no rights entitled to be respected. *Cowp.* 711, 712; 1 *Cranch*, 70, 100; *Everenden v. Beaumont*, 7 *Mass.* 76; *Bullard v. Hinckley*, 5 *Greenl.* 272; *Co. Lit.* 57, *b.*; *Dyer* 266, *b.*

4. But admitting, for the sake of the argument, that the committee were deceived; yet the *tenant* is not entitled to this objection; which can only be made by the grantor; as in the cases of infancy or duress. *Worcester v. Eaton*, 11 *Mass.* 371. It was on this principle that *Story J.* held that the associate of this demandant could not avail himself of the fraud practised by *McGlathry* against *Budge*, in obtaining judgment against him. *Dunlap & al. v. Stetson*, 4 *Mason*, 349.

5. The deed from the committee to the demandant, being a grant by Massachusetts, which had received a solemn judicial exposition in the case of *Lambert v. Carr*, in which it was established that the

committee were the exclusive and final judges of the claims of settlers, is now confirmed by the Constitution of Maine, *Art.* 10, *sec.* 5, *condition* 7; and cannot be impeached in this State, nor vacated by its tribunals.

6. The instruction requested from the judge, but which he declined giving to the jury, was pertinent to the issue; and was therefore improperly refused. There was evidence, from which it was plainly to be inferred that the committee knew of the claim of *McGlathry.* They passed it over through inadvertence, or design. On the former supposition, the jury had already been instructed by the judge. But if they adjudicated on his claim, and designedly rejected it, as, by the decision of *Lambert v. Carr,* they had the right to do, it was no more fraud in the demandant to reap the benefit of that decision, than for any other party to have the benefit of a judgment fairly rendered in his favor by a competent tribunal.

*W. D. Williamson,* for the tenant.

The opinion of the Court was read at the ensuing *October* term, as drawn up by

MELLEN C. J. We have listened with attention to the arguments of the respective counsel, and have since deliberately re-examined the facts, and the principles adduced to support and resist the motion for a new trial; and although for some time we were not able to unite in any conclusions, yet on further discussion and reflection, we became satisfied with the opinion which we have formed. This opinion, with the reasons on which it is founded, will now be delivered.

Several reasons have been urged by the counsel for the demandant in support of the motion; these we will consider separately, though not in the order in which they are presented in the report.

1. As the deed from the committee contains no exception of the acre previously conveyed by *Budge* to *McGlathry,* it is contended that the tenant has no right to impeach the deed on any of the alleged grounds; but as it is admitted that he claims under *McGlathry,* he has a direct interest in the question in issue, and has the same right to impeach the conveyance on those grounds as *McGla-*

*thry* himself would have if he were the tenant in this action. This simple answer is sufficient, without being further extended.

2. It is denied that *McGlathry* was a settler, within the true meaning of any of the resolves offered in evidence; and that if he was a settler, he had not complied with the terms prescribed, and so was not entitled to a deed of the disputed acre from the committee. The answer to this objection is plain and obvious. Neither of the parties in this case, nor the committee, ever considered him as the original settler, but only as the assignee of a settler. The deed from the committee describes *James Budge* as the original settler, and they recognized him as such. This objection, therefore, may at once be laid out of the case as wholly unimportant.

3. The third objection has an intimate connection with the one just answered, and a part of it is involved in that. This however proceeds on the ground that, although *McGlathry* was the assignee of *Budge*, still he was not such a legal representative of him, as to be entitled under any of said resolves, to a deed of the acre from the committee of the Commonwealth. This argument seems to the court to be founded upon too narrow a construction of the terms " legal representative." We apprehend the legislature never could have intended merely the " heirs, executors or administrators" of a settler, to the exclusion of his legal assignees. Such a construction would be an unreasonable limitation of the bounty intended by them, as it would have operated to prevent settlers from realizing any advantages from the provisions of the resolves directly or indirectly, in case of a transfer of their possessory interests. Besides, the argument of the demandant's counsel is unfortunate in being liable to the objection that it proves too much. By the report it appears that *Budge* conveyed all his farm, (except the acre in question,) to *Peck*, who conveyed the same to *Wilde*; and he conveyed an undivided moiety of the same to *French* and the demandant. Now *Peck*, under whom the demandant claims, and *McGlathry*, under whom the tenant claims, were both of them assignees of *Budge*, in different proportions; and one of them was as well entitled to a deed from the committee as the other. And if nothing could legally pass by their deed to an assignee of *Budge*, because he was not his legal

24

representative, according to the construction of the demandant's counsel, then it would follow that nothing passed by the deed to *Peck*; the consequence of which would be that upon that principle, if on no other, there ought to be judgment on the verdict.

4. In the next place it is contended that by the *seventh* provision in the first section of the act relating to the separation of the District of Maine from Massachusetts proper, and forming it into a separate and independent State, the deed from the committee to *Lapish*, *French* and *Stetson* has been confirmed; and as the foregoing provision, with others, is incorporated into the constitution of this State, no tribunal thereof can now legally invalidate or set it aside. The language of the above mentioned provision relating to the point is this;—" All grants of land, franchises, immunities, corporate or other rights, and all contracts for, or grants of land not yet located, which have been, or may be made by the said Commonwealth, before the separation of said District shall take place, and having, or to have effect within the said District, shall continue in full force, after the said District shall become a separate State." It is very questionable whether the above cited provision was intended to have any relation to conveyances made by the agents of the Commonwealth, in the common form of deeds. It would seem from the words " grants of land, franchises, immunities, corporate and other rights," that the immediate acts of the legislature were intended. But, be that as it may; the expression is that they " shall continue in full force"; which implies legal and effectual grants, and, as such, being then in force. But we can never presume that the legislature intended that grants or deeds should be more binding and sacred in this State and in its judicial courts, than they would have been in the judicial courts of Massachusetts, provided Maine had never been erected into a separate State. It would be a singular construction of the language quoted, to consider it as designed to confirm and sanction a deed fraudulently obtained from an agent of the Commonwealth, and to deprive the courts of justice in this State of the power of examining and deciding a title, depending on such deed, according to the unquestioned principles of the common law. We do not feel at liberty to countenance this objection.

5. The next objection relied on has reference to the instructions of the judge to the jury on the subject of the alleged fraud in the procurement of the deed by the demandant from the committee. He instructed them that " if the committee had before them the evidence of *McGlathry's* title to the acre under *Budge,* but it escaped their attention, and therefore was not noticed in their deed to *Lapish* and others ; and if *Lapish* when he took the deed then perceived, though for the first time, that the acre was not excepted, and took the deed with intent to defraud *McGlathry,* to deprive him of the acre, and to hold it against him; this would vitiate the deed, as to that acre, and so far render it void ;" and " that it would be a fraud, not only on *McGlathry,* but on *Budge,* his warrantor of the acre."

It is contended that this instruction cannot be sustained upon legal principles; that unless the demandant was instrumental in causing the omission of the exception of the acre in the deed of the committee, his mere silence when he saw the mistake which they had carelessly made, and his receiving the deed under such circumstances, did not amount to a fraud on his part which would vitiate the deed ; though it might render *Lapish, French* and *Stetson* trustees of the acre ; and, as such, compellable in a court of equity to convey the same to those entitled to the estate therein. In support of this objection it has been urged that the whole subject in relation to the contending titles to the acre conveyed to *McGlathry,* and afterwards by the committee to the demandants and others, has recently undergone a critical and laborious examination in the Circuit Court of the United States in the case of *Dunlap & al. v. Stetson,* 4 *Mason,* 349 ; and that the learned judge who tried the cause decided that there was no ground for the imputation of fraud on the part of the grantees, but that the deed, as to the acre, conveyed an estate to them in trust. The force of this argument disappears when we consider that the case abovementioned was a bill in equity, and that the defendant in his answer had expressly denied all fraud and management; and the answer being under oath, and not disproved, was of itself proof that no fraud existed in the obtainment of the deed from the committee ; or at least it removed all presumption of fraud ; and even if any existed, the case was left destitute of all proof of it. But the

case furnishes us with no principles of law repugnant to those delivered to the jury in the instructions we are considering. On the contrary, principles directly establishing the same doctrine are strongly stated. He observes—" would it be pretended, that if a man should fraudulently procure from the Commonwealth a title to lands intended for another, either by its bounty or its contract, by misrepresenting himself to be that person or his assignee, that he should possess the land, thus procured by his fraud or misrepresentation, free of all claims of the injured party? That because his deception had been complete, therefore it should constitute and perpetuate an unimpeachable title? A court of law would not hesitate to set aside such a conveyance. No conveyance is so sacred, that, if infected by fraud, it may not be overturned." Again he observes, when speaking of the grantees,—" If they represented themselves as the sole owners, or, knowing the mistake of the commissioners, if they took the deed, intending to defraud *McGlathry*, the transaction, both at law and in equity, would be pronounced void for the fraud, and the deed be set aside on that account as well against *McGlathry* and his assignees, as against the Commonwealth."

We have examined the cases cited by the counsel for the demandant, but do not perceive that any of them, except *Laidlaw v. Organ*, 2 *Wheat*. 178, have any special bearing upon the point now under examination. In that case *Organ*, having heard of the news of peace at *New Orleans*, purchased a quantity of tobacco of *Laidlaw* who had not heard of it; and a few moments before the sale was completed, being asked whether there was any intelligence calculated to enhance the price of tobacco, *Organ* remained silent. *Marshall*, *C. J.* says—" The question is whether the intelligence of extrinsic circumstances, which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated. The court is of opinion he was not bound to communicate it; but at the same time each party must take care not to say or do any thing to impose upon the other. It would be difficult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties." A note is added by the reporter from *Pothier* in

these words : " Where the vendee conceals from the vendor the knowledge he may have, touching the thing sold, and which the vendor may not possess, it does not vitiate the sale ; because the vendor ought to know best the quality of the articles he sells ; and if he does not it is his own fault." In the above named case the principle decided had reference to the intelligence of extrinsic circumstances, as it is expressed, or the general knowledge of business or public events ; and the note subjoined has reference to knowledge of some fact, in relation to an article, possessed only by the vendee. In the case at bar no want of knowledge is imputed to either party. The instruction complained of was, that if the committee knew of the title of *McGlathry* to the acre, but that the fact escaped their recollection when they made the deed ; and if *Lapish* saw their mistake, arising from that forgetfulness, but fraudulently received the deed with intent to hold the land which belonged to *McGlathry* ; then such a transaction would vitiate and avoid the deed. Thus far, certainly, a difference exists between the cases. That case seems to us to go as far as moral principles will justify, even in cases of that description, depending on public intelligence ; and further than the same Court seemed willing to go in the case of *Etting v. Bank of United States*, 11 *Wheat.* 59. In that case it appeared that *McCullough* had been cashier of the Branch bank at *Baltimore*, and had been guilty of a fraudulent appropriation of a large sum of money belonging to the bank to his own use. The fact being discovered, it was resolved on by the directors that he should be removed. He was immediately called upon for security, which after some time was procured. As a part of the security furnished, a note was given by *McCullough*, indorsed by *Etting*. After the bank had obtained security in full, and not till then, *McCullough* was immediately removed from the office of cashier. As soon as *Etting* discovered what the transactions of the directors had been, he refused to pay the note, on the ground that he had been misled, deceived and defrauded by their conduct, and the concealment of the facts from his knowledge. A verdict was returned in favor of the defendant. The Circuit Court instructed the jury that if they should find that the directors contemplated, though they did not

promulgate, the removal of the cashier as soon as security should be furnished ; that *Etting* indorsed the note in ignorance of the fraud of the cashier, or probability of his removal ; and that he would not have indorsed the note had he known the circumstances ; and that the bank did not disclose their intention to remove the cashier, lest it should increase the difficulty of his procuring security or prevent it ; yet if *Etting* indorsed the note at the request of the cashier, without making any inquiries of the bank, or having any communication with them, the plaintiffs were entitled to recover ; and that the note was binding on the defendant, unless he had shown such inquiries or communication, and a misrepresentation or concealment on the part of the bank. The court were requested by the counsel of *Etting* to instruct the jury that if they should find that the directors knew of *McCullough's* fraud and insolvency ; that thereupon they resolved to remove him, but concealed the facts and continued him in office for the purpose of obtaining security, and that *Etting* was ignorant of the above facts ; that then the plaintiffs were not entitled to recover. But the court refused to give this instruction, unless the jury should be further of opinion that the defendant was led into this state of ignorance in consequence of inquiries made of the plaintiffs, or some previous communication between them and him. *Etting's* counsel filed a bill of exceptions, and thereupon a writ of error was brought. After long and learned argument, the court, consisting of six of the judges, were equally divided ; and though by the rule of the court in such cases, the judgment was affirmed, yet the case shews that the court did not sustain the opinion of the Circuit Court, that inquiry or communication for the purpose of information was necessary to create the obligation to disclose material facts. " The fraud, said the counsel, " consists, in such cases, in dealing with the party in ignorance, and leaving him so. It is not necessary that the other party should have created the false impression or intended it ; it is sufficient that he knows it, and takes advantage of it." In support of this general principle may be cited, *Stuart v. Wilkins*, 1 *Dougl.* 18 ; *Cockshot v. Bennet*, 2 *D. & E.* 763 ; *Jackson v. Duchaire*, 3 *D. & E.* 551. In the instruction of the judge to the jury in the case at bar, a part of it was that if *La-*

pish saw the mistake, but took the deed with intent to defraud McGlathry, it would vitiate the deed as to the acre. The question of fraudulent intent was properly submitted to the jury, and they have found the fraud. Upon authority we cannot perceive any incorrectness in the instruction. Lapish was instrumental in giving it effect; because the deed could have no operation as to any part of the land, until delivery, and acceptance of it; and he received and accepted the deed, knowing there was a mistake in it, important in its nature, and that the committee had, through mere inattention, committed the mistake. The laws of morality can never give sanction to such a proceeding; and it surely cannot be the duty of a court of justice to be more indulgent in its judgment. It would be a reproach to our laws and tribunals which administer them, to permit fraud to accomplish its designs, when those designs are detected and disclosed. In the case before us the jury, who are the exclusive judges of facts, have by their verdict pronounced that the deed in question was fraudulently obtained from the committee. The objection therefore, to the instruction to the jury on the point we have been considering is not sustained.

6. The last objection is to the refusal of the judge to give certain requested instructions. The cases cited in support of it shew that it is the duty of a judge to instruct the jury upon any point which is pertinent to the issue; though not as to abstract principles which are irrelevant. The inquiry, therefore, is whether the instructions requested, were pertinent to the issue? The judge was requested to instruct the jury that if the committee perceived the exception of the acre sold to McGlathry, as stated in the deeds from Budge down to Lapish and his associates, but considered McGlathry as not entitled to any land under the resolve, and intentionally excluded him, meaning to convey the whole to Lapish and his co-tenants, it was not a fraud in the latter to receive such a deed. On this part of the cause there has been some vibration of opinion; but on consideration we are satisfied that the requested instruction had been virtually and essentially though not formally given, and was included in the instructions which we have just been examining. He presented to the consideration of the jury a number of particulars re-

specting the deed, and the conduct of *Lapish* at the time of its execution and delivery ; and instructed them that if they should find all those particulars true, then the deed was void as to the acre. This amounted to a distinct expression of his opinion that if they should not find them all true, then the deed was not void. The implication is so strong that it could not be misunderstood. The jury had no authority from the court to consider the deed as void, except in one case and under certain specified circumstances. They have found that all those circumstances existed, viz. the committee's knowledge of *McGlathry's* title to the acre ; their forgetfulness of the fact when the deed was executed ; the knowledge of *Lapish* of the mistake in the deed ; and his silence and acceptance of the deed with intent to defraud *McGlathry*. All these are totally repugnant to the facts assumed as the basis of the requested instruction, and the verdict proves that if given, it could not have changed the aspect of the cause, or been productive of any legal consequences in relation to either of the parties. It cannot therefore be considered as relevant. The instruction called for, in fact, amounted to no more than this, that if *Lapish* received just such a deed as the committee intended to give, in the honest execution of their supposed powers, it was no fraud in him. This seems to bear a strong resemblance to an abstract proposition, and even to a self-evident one. We think the judge was justified in declining to give the instruction, for the reasons we have mentioned.

Knowing, as we have reason to know, that this cause, and others on the docket, growing out of the same transactions, are important in a pecuniary point of view, and interesting to the feelings of all the parties connected ; we have been disposed to assign the reasons of our opinion more at large than usual. And though from the evidence disclosed by the report, we cannot readily perceive the advantages of another trial, or any peculiar equity in the claim of the demandant ; still we should promptly have set aside the verdict and submitted the cause to another jury, had legal principles demanded it. But those principles render such a course improper.

*Judgment on the verdict.*