15 U.S. 178
 4 L.Ed. 214
 2 Wheat. 178
 LAIDLAW et al.
v.
ORGAN.
 March 15, 1817
 
 ERROR to the district court for the Louisiana district.
 The defendant in error filed his petition, or libel, in the court below, stating, that on the 18th day of February, 1815, he purchased of the plaintiffs in error one hundred and eleven hogsheads of tobacco, as appeared by the copy of a bill of parcels annexed, and that the same were delivered to him by the said Laidlaw & Co., and that he was in the lawful and quiet possession of the said tobacco, when, on the 20th day of the said month, the said Laidlaw & Co., by force, and of their own wrong, took possession of the same, and unlawfully withheld the same from the petitioner, notwithstanding he was at all times, and still was, ready to do and perform all things on his part stipulated to be done and performed in relation to said purchase, and had actually tendered to the said Laidlaw & Co. bills of exchange for the amount of the purchase money, agreeably to the said contract; to his damage, &c. Wherefore the petition prayed that the said Laidlaw & Co. might be cited to appear and answer to his plaint, and that judgment might be rendered against them for his damages, &c. And inasmuch as the petitioner did verily believe that the said one hundred and eleven hogsheads of tobacco would be removed, concealed, or disposed of by the said Laidlaw & Co., he prayed that a writ of sequestration might issue, and that the same might be sequestered in the hands of the marshal, to abide the judgment of the court, and that the said one hundred and eleven hogsheads of tobacco might be finally adjudged to the petitioner, together with his damages, &c., and costs of suit, and that the petitioner might have such other and farther relief as to the court should seem meet, &c.
 The bill of parcels referred to in the petition was in the following words and figures, to wit:
 'Mr. Organ Bo't of Peter Laidlaw & Co. 111 hhds. Tobacco, weighing 120,715 pounds n't. fr. $7,544.69.
 'New-Orleans, 18th February, 1815.'
 On the 21st of February, 1815, a citation to the said Laidlaw & Co. was issued, and a writ of sequestration, by order of the court, to the marshal, commanding him to sequester 111 hogsheads of tobacco in their possession, and the same so sequestered to take into his (the marshal's) possession, and safely keep, until the farther order of the court; which was duly executed by the marshal. And on the 2d of March, 1815, counsel having been heard in the case, it was ordered, that the petitioner enter into a bond or stipulation, with sufficient sureties in the sum of 1,000 dollars, to the said Laidlaw & Co., to indemnify them for the damages which they might sustain in consequence of prosecuting the writ of sequestration granted in the case.a
 
 
 a
 Sequestration, in the practice of the civil law, is a process to take judicial custody of the res or persona in controversv to abide the event of the suit. It may be applied to real or personal property, the right to which is litigated between the parties, or even to persons, as to a married woman, in a cause of divorce, in order to preserve her from ill treatment on the part of her husband, or to a minor in order to secure him from ill treatment by his parents. Clerke's Prax. Tit. 43. Pothier, de la Proc edure Civile, Partie I, Chap. 3. art. 2. § 1. Code Napoleon, Liv. 3. tit. 11., Des D ep ots et du S equestre, art. 1961. Digest of the Civil laws of Louisiana, 419. The sequestration may be demanded, either in the original petition, or in the progress of the cause at any time before it is set down for hearing by a petition from the party demanding it, with notice to the opposite party, on which the judge, after hearing counsel, pronounces his interlocutory sentence or decree. This sentence is to be provisionally executed notwithstanding an appeal. The sequestration is usually ordered, in possessory actions, where the preliminary proofs of the parties appear to be nearly balanced; where an inheritance consisting of personal effects of great value is in controversy; where there is ground to apprehend that the parties may resort to personal violence in contesting the enjoyment of the mesne profits; in actions of partition, where the property in litigation cannot be quietly enjoyed by the respective owners; and sometimes in cases where the suit is likely to be of long duration. Pothier, Ib. and § 2.
 
 
 b
 1 Comyn on Contr. 38. and the authorities there cited.
 
 
 c
 Pothier, De Vente, Nos. 233 to 241. He considers this question under the four following heads. 1st. Whether good faith obliges the vendor, at least in foro conscientiae, not only to refrain from practising any deception, but also from using any mental reservation? 2d. What reservation binds the party in the civil forum, and to what obligations? 3d. Whether the vendor is bound, at least in foro conscientiae, not to conceal any circumstances, even extrinsic, which the vendee has an interest in knowing? 4th. Whether the vendor may, in foro conscientiae, sometimes sell at a price above the true value of the article. As Pothier's discussion throws great light on this subject, a translation of this part of his admirable treatise may not be unacceptable to the reader.
 
 
 d
 Dixon v. Cooper, 3 Wils. 40. 1 Atk. 248. Benjamin v. Porteus, 2 H. Bl. 590. Mackay v. Rhinelander et al., 1 Johns. Cas. 408. Jones v. Hake, 2 Johns Cas. 60. Burlingame v. Dyer, Johns. Rep. 189. The decree was for a specific performance, and the vendors took the bills out of court. 2. The judge's charge was right, there being no evidence of fraud. The vendee's silence was not legal evidence of fraud, and, therefore, there was no conflict of testimony on this point: it was exclusively a question of law; the law was with the plaintiff; and, consequently, the court did right to instruct the jury to find for the plaintiff. 3. Mr. Girault was an inadmissible witness. He and his partners were general merchants as well as factors. They sold in their own names, and might call the article their own or the property of their principals, as it suited them. But they were parties to the suit, and the intervention of their principals did not abate the suit as to them.e
 
 
 e
 Intervention is a proceeding by which a third person petitions to be received as a party in a cause, either with the plaintiff or the defendant, and to prosecute the suit jointly with the party whose interests may be connected with his own. It may take place either before or after the cause is at issue, and set down for hearing; either in the court below, or upon appeal. But it cannot operate to retard the adjudication of the principal cause; which may either be determined separately, or the whole controversy may be decided by one and the same judgment. Clerke's Prax. tit. 38, 39. Pothier, De la Proc edure Civile, Partie 1, chap. 2, art. 3. § 3. Code de Proc edure Civile, Partie 1. Liv. 2. tit. 16. De l'Intervention, art. 339, 340. It may take place where the goods of one person are attached as the property or for the debt of another. Clerke's Prax. Ib. In actions of warranty, Pothier, Ib. Partie 1. chap. 2. art. 2. § 2. Code de Proc edure Civile, 1ere Partie Liv. 2. tit. 9. Des Exceptions Dilatoires, art. 183. So also in a suit for separation of property between husband and wife, the creditors of the husband may intervene for the preservation of their rights. Ib. 2 Partie. Liv. 1. tit. 8. Des Separations de Biens, art. 871.
 
 
 On the 22d of March, 1815, the plaintiffs in error filed their answer, stating that they had no property in the said tobacco claimed by the said petitioner or ownership whatever in the same, nor had they at any time previous to the bringing of said suit; but disclaimed all right, title, interest, and claim, to the said tobacco, the subject of the suit. And on the same day, Messrs. Boorman & Johnston filed their bill of interpleader or intervention, stating that the petitioner having brought his suit, and filed his petition, claiming of the said Laidlaw & Co. 111 hogsheads of tobacco, for which he had obtained a writ of sequestration, when, in truth, the said tobacco belonged to the said Boorman & Johnston, and was not the property of the said Laidlaw & Co., and praying that they, the said Boorman & Johnston, might be admitted to defend their right, title, and claim, to the said tobacco, against the claim and pretensions of the petitioner, the justice of whose claim, under the sale as stated in his petition, was wholly denied, and that the said tobacco might be restored to them, &c.
 On the 20th of April, 1815, the cause was tried by a jury, who returned the following verdict, to wit: 'The jury find for the plaintiff, for the tobacco named in the petition, without damages, payable as per contract.' Whereupon the court rendered judgment 'that the plaintiff recover of the said defendants the said 111 hogsheads of tobacco, mentioned in the plaintiff's petition, and sequestered in this suit, with his costs of suit to be taxed; and ordered, that the marshal deliver the said tobacco to the said plaintiff, and that he have execution for his costs aforesaid, upon the said plaintiff's depositing in this court his bills of exchange for the amount of the purchase money endorsed, &c., for the use of the defendants, agreeably to the verdict of the jury.'
 On the 29th of April, 1815, the plaintiffs in error filed the following bill of exceptions, to wit: 'Be it remembered, that on the 20th day of April, in the year of our Lord, 1815, the above cause came on for trial before a jury duly sworn and empannelled, the said Peter Laidlaw & Co. having filed a disclaimer, and Boorman and Johnston of the city of New-York, having filed their claim. And now the said Hector M. Organ having closed his testimony, the said claimants, by their counsel, offered Francis Girault, one of the above firm of Peter Laidlaw & Co., as their witness; whereupon the counsel for the plaintiff objected to his being sworn, on the ground of his incompetency. The claimants proved that Peter Laidlaw & Co., before named, were, at the date of the transaction which gave rise to the above suit, commission merchants, and were then known in the city of New-Orleans as such, and that it is invariably the course of trade in said city for commission merchants to make purchases and sales in their own names for the use of their employers; upon which the claimants again urged the propriety of suffering the said Francis Girault to be sworn, it appearing in evidence that the contract was made by Organ, the plaintiff, with said Girault, one of the said firm of Peter I aidlaw & Co. in their own name, and there being evidence that factors and commission merchants do business on their own account as well as for others, and there being no evidence that the plaintiff, at the time of the contract, had any knowledge of the existence of any other interest in the said tobacco, except that of the defendants, Peter Laidlaw & Co. The court sustained the objection, and rejected the said witness. To which decision of the court the counsel for the claimants aforesaid begged leave to except, and prayed that this bill of exceptions might be signed and allowed. And it appearing in evidence in the said cause, that on the night of the 18th of February, 1815, Messrs. Livingston, White, and Shepherd brought from the British fleet the news that a treaty of peace had been signed at Ghent by the American and British commissioners, contained in a letter from Lord Bathurst to the Lord Mayor of London, published in the British newspapers, and that Mr. White caused the same to be made public in a handbill on Sunday morning, 8 o'clock, the 19th of February, 1815, and that the brother of Mr. Shepherd, one of these gentlemen, and who was interested in one-third of the profits of the purchase set forth in said plaintiff's petition, had, on Sunday morning, the 19th of February, 1815, communicated said news to the plaintiff; that the said plaintiff, on receiving said news, called on Francis Girault, (with whom he had been bargaining for the tobacco mentioned in the petition, the evening previous,) said Francis Girault being one of the said house of trade of Peter Laidlaw & Co., soon after sunrise on the morning of Sunday, the 19th of February, 1815, before he had heard said news. Said Girault asked if there was any news which was calculated to enhance the price or value of the article about to be purchased; and that the said purchase was then and there made, and the bill of parcels annexed to the plaintiff's petition delivered to the plaintiff between 8 and 9 o'clock in the morning of that day; and that in consequence of said news the value of said article had risen from 30 to 50 per cent. There being no evidence that the plaintiff had asserted or suggested any thing to the said Girault, calculated to impose upon him with respect to said news, and to induce him to think or believe that it did not exist; and it appearing that the said Girault, when applied to, on the next day, Monday, the 20th of February, 1815, on behalf of the plaintiff, for an invoice of said tobacco, did not then object to the said sale, but promised to deliver the invoice to the said plaintiff in the course of the forenoon of that day; the court charged the jury to find for the plaintiff. Wherefore, that justice, by due course of law, may be done in this case, the counsel of said defendants, for them, and on their behalf, prays the court that this bill of exceptions be filed, allowed, and certified as the law directs.
 (Signed,) DOMINICK A. HALL,
 District Judge.
 New-Orleans, this 3d day of May, 1815.'
 On the 29th of April, 1815, a writ of error was allowed to this court, and on the 3d of May, 1815, the defendant in error deposited in the court below, for the use of the plaintiffs in error, the bills of exchange mentioned in the pleadings, according to the verdict of the jury and the judgment of the court thereon, which bills were thereupon taken out of court by the plaintiffs in error.
 Feb. 20th.
 Mr. C. J. Ingersoll, for the plaintiffs in error. 1. The first question is, whether the sale, under the circumstances of the case, was a valid sale; whether fraud, which vitiates every contract, must be proved by the communication of positive misinformation, or by withholding information when asked. Suppression of material circumstances within the knowledge of the vendee, and not accessible to the vendor, is equivalent to fraud, and vitiates the contract.b Pothier, in discussing this subject, adopts the distinction of the forum of conscience, and the forum of law; but he admits that fides est servanda.c The parties treated on an unequal footing, as the one
 'ARTICLE I. 233. Although, in many transactions of civil society, the rules of good faith only require us to refrain from falsehood, and permit us to conceal from others that which they have an interest in knowing if we have an equal interest in concealing it from them; yet, in interested contracts, among which is the contract of sale, good faith not only forbids the assertion of falsehood, but also all reservation concerning that which the person with whom we contract has an interest in knowing, touching the thing which is the object of the contract.
 'The reason is that equity and justice, in these contracts, consists in equality. It is evident that any reservation, by one of the contracting parties, concerning any circumstance which the other has an interest in knowing, touching the object of the contract, is fatal to this equality: for the moment the one acquires a knowledge of this object superior to the other, he has an advantage over the other in contracting; he knows better what he is doing than the other; and, consequently, equality is no longer found in the contract.
 'In applying these principles to the contract of sale, it follows that the vendor is obliged to disclose every circumstance within his knowledge touching the thing which the vendee has an interest in knowing, and that he sins against that good faith which ought to reign in this contract, if he conceals any such circumstance from him.
 'This is what Florentinus teaches in the law 43. § 2. Dig. De contr. empt. Dolum malum a se abesse proestare venditor debet, qui non tantum in eo est qui fallendi causd obscur e loquitur, sed etiam qui insidiose, obscure dissimulat. party had received intelligence of the peace of Ghent, at the time of the contract, and the other had not. This news was unexpected, even at Washington, much more at New-Orleans, the recent scene of the most sanguinary operations of the war. In answer to the question, whether there was any news calculated to enhance the price of the article, the vendee was silent. This reserve, when such a question was asked, was equivalent to a false answer, and as much calculated to deceive as the communication of the most fabulous intelligence. Though the plaintiffs in error, after they heard the news of peace, still went on, in ignorance of their legal rights, to complete the contract, equity will protect them. 2. Mr. Girault was improperly rejected as a witness, because he and his partner had disclaimed, and Messrs. Boorman & Johnston, the real owners of the tobacco, had intervened and taken the place of the original defendants. Girault was not obliged to disclose his character of agent, and, as such, he was an admissible witness.d The tendency of the modern decisions to let objections go to the credibility, and not to the competency of witnesses, ought to be encouraged as an improvement in the jurisprudence on this subject. Besides, the proceedings are essentially in rem, according to the course of the civil law, and that consideration is conclusive as to the admissibility of the witness. 3. The court below had no right to charge the jury absolutely to find for the plaintiff. It was a mixed question of fact and law, which ought to have been left to the jury to decide. 4. There is error in the judgment of the court, in decreeing a deposit of the bills of exchange by the vendee for the tobacco, no such agreement being proved.
 Mr. Key contra, 1. Though there be no testimony in the record to show a contract for payment in bills of exchange, still the court may infer that such was the contract from the petition of the plaintiff below, supported as it is by his oath, and uncontradicted, as to this fact, by the defendant's answer.
 Interest in the subject matter of the suit is a fatal objection to the competency of a witness by the civil law; (Pothier, Id. Partie 2. chap. 3.art. 4. § 3.;) but according to the above authorities, Mr. Girault appears to have been an inadmissible witness, because still a party to the cause notwithstanding the intervention of his principals. On every ground, therefore, Mr. Girault was an inadmissible witness. 4. The only real question in the cause is, whether the sale was invalid because the vendee did not communicate information which he received precisely as the vendor might have got it had he been equally diligent or equally fortunate? And, surely, on this question there can be no doubt. Even if the vendor had been entitled to the disclosure, he waived it by not insisting on an answer to his question; and the silence of the vendee might as well have been interpreted into an affirmative as a negative answer. But, on principle, he was not bound to disclose. Even admitting that his conduct was unlawful, in foro conscientiae, does that prove that it was so in the civil forum? Human laws are imperfect in this respect, and the sphere of morality is more extensive than the limits of civil jurisdiction. The maxim of caveat emptor could never have crept into the law, if the province of ethics had been co-extensive with it. There was, in the present case, no circumvention or manoeuvre practised by the vendee, unless rising earlier in the morning, and obtaining by superior diligence and alertness that intelligence by which the price of commodities was regulated, be such. It is a romantic equality that is contended for on the other side. Parties never can be precisely equal in knowledge, either of facts or of the inferences from such facts, and both must concur in order to satisfy the rule contended for. The absence of all authority in England and the United States, both great commercial countries, speaks volumes against the reasonableness and practicability of such a rule.
 Mr. C. J. Ingersoll, in reply. Though the record may not show that any thing tending to mislead by positive assertion was said by the vendee, in answer to the question proposed by Mr. Girault, yet it is a case of manoeuvre; of mental reservation; of circumvention. The information was monopolized by the messengers from the British fleet, and not imparted to the public at large until it was too late for the vendor to save himself. The rule of law and of ethics is the same. It is not a romantic, but a practical and legal rule of equality and good faith that is proposed to be applied. The answer of Boorman & Johnston denies the whole of the petition, and consequently denies that payment was to be in bills of exchange; and their taking the bills out of court, ought not to prejudice them. There is nothing in the record to show that the vendors were general merchants, and they disclosed their principals when they came to plead. The judge undertook to decide from the testimony, that there was no fraud; in so doing he invaded the province of the jury; he should have left it to the jury, expressing his opinion merely.
 Mr. Chief Justice MARSHALL delivered the opinion of the court.
 
 
 1
 The question in this case is, whether the intelligence of extrinsic circumstances, which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor? The court is of opinion that he was not bound to communicate it. It would be difficult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties. But at the same time, each party must take care not to say or do any thing tending to impose upon the other. The court thinks that the absolute instruction of the judge was erroneous, and that the question, whether any imposition was practised by the vendee upon the vendor ought to have been submitted to the jury. For these reasons the judgment must be reversed, and the cause remanded to the district court of Louisiana, with directions to award a venire facias de novo.
 
 
 2
 Venire de novo awarded.
 
 
 
 '234. According to these principles the vendor is obliged not to conceal any of the defects of the article sold, which are within his knowledge, although these defects may not be such as fall within an implied warranty, but even such defects as the vendee would have no right to complain of, if the vendor who had not disclosed them was ignorant of their existence. Cum ex XII. tabulis, says Cicero, (Lib 3. de Off.) satis esset cautum ea praestare quae essent lingu a nuncuipata; a j urisconsultis, etiam reticencioe poena constituta, quidquid enim inest proedio vitii id statuerunt, si venditor sciret, nisi nominatim dictum esset, proestare oportere. The vendor, in this case, is held in id quanti (emptoris) intererit scisse. Dig. l. 4. De act. empt. and this r eservation may sometimes authorize a rescinding of the contract. 1. 11, § 5. Dig. de tit.
 '235. This rule ought to be applied, although the vendor, who has concealed the defects in the thing sold, has not sold it for more than its value with these defects. The reason is that he who sells me a thing has no right to require that I should pay the highest price for it, unless I consent to buy it for that price; he has no right to require of me a higher price than that which I voluntarily give, and he ought not to practise any artifice to induce me to consent to buy it at a higher price than I should have been willing to give had I known the defects which he had maliciously concealed.
 '236. Good faith obliges the vendor, not only not to conceal any of the intrinsic vices of the thing sold, but generally not to dissemble any circumstance concerning it which might induce the vendee not to buy, or not to buy at so high a price. For example, the vendee may have his action against the vendor if the latter has concealed the existence of a bad neighbourhood to a real estate sold by him, which might have prevented the vendee from purchasing had he known it: Si quis in vendendo proedio confinem celaverit, quem emptor si audisset, empturus non esset. Dig. L. 15. § 8. De contr. empt.
 '237. These principles of the Roman jurisconsults, are more accurate and more conformable to justice than the decision of St. Thomas, which permits the vendor to conceal the vices of the thing sold, except in two cases, 1. If the vice be of a nature to cause the vendee some injury; and 2. If the vendor availed himself of his reservation in order to sell the thing at a higher price than it was worth. This decision appears to me to be unjust, since, as the vendor is perfectly at liberty to sell or not to sell, he ought to leave the vendee perfectly at liberty to buy or not to buy, even for a fair price, if that price does not suit the buyer: it is, therefore, unjust to lay a snare for this liberty which the vendee ought to enjoy, by concealing from him the vice of the thing, in order to induce him to buy that which he would not have been willing to buy for the price at which it is sold to him, had he known its defects.
 'ARTICLE II. 238. Although it is with respect to the civil forum that the Roman jurisconsults have established the principles which we have stated, touching the obligation of the vendor not to conceal from the vendee any circumstance relative to the thing sold, and although they ought to be exactly followed, in foro conscientioe, yet they are little observed in our tribunals, and the vendee is not easily listened to who complains of the concealment of some vice in the thing sold, unless it be such a defect as falls within the doctrine of implied warranty. The interest of commerce not permitting parties to set aside their contracts with too much facility, they must impute it to their own fault in not having better informed themselves of the defects in the commodities they have purchased.
 '239. There are, nevertheless, certain reservations touching the thing sold which have been thought worthy of the attention of the law, and which are obligatory on the vendor in the civil forum; as for instance, when the vendor knows that the thing which he sells does not belong to him, or that it does not irrevocably belong to him, or that it is subject to certain incumbrances, and conceals these facts from the vendee,' &c.
 'ARTICLE III. 241. Cicero, in the third book of his Offices, has treated this question in the case of a corn-merchant, who being arrived at Rhodes, in a time of scarcity, before a great number of other vessels loaded with corn, exposes his own for sale: Cicero proposes the question whether this merchant is obliged to inform the buyers that there are a great number of other vessels on their voyage, and near the port? He states, upon this question, the sentiments of two stoic philosophers, Diogenes and Antipater; Diogenes thought that the merchant might lawfully withhold the knowledge which he had of the vessels on the point of arriving, and sell his corn at the current price: Antipater, his disciple, whose decision Cicero appears to adopt, thought, on the contrary, that this dissimulation was contrary to good faith. The reason on which he grounds this opinion is that the concord which ought to exist among men, the affection which we ought to bear to each other, cannot permit us to prefer our private interest to the interest of our neighbour, from whence it follows that, though we may conceal some things from prudence, we cannot conceal, for the sake of profit, facts which those with whom we contract have an interest in knowing. Hoc celandi genus, says he, non aperti, non simplicis, non ingenui; non justi, non viri boni: vertuti potius, obscuri, astuti, fallacis, malitiosi, callidi, veteratoris, vafri.
 'This question only concerns the forum of conscience; for there can be no doubt that in the civil forum, the demand of a vendee cannot be listened to who complains that the vendor has not disclosed to him all the extrinsic circumstances relative to the thing sold, whatever interest the vendee might have in knowing them. The decision of Cicero is somewhat difficult to maintain even in the forum of conscience. The greater part of the writers on natural law have considered it as unreasonable.
 'These writers are of opinion, that the good faith which ought to govern the contract of sale, only requires that the vendor should represent the thing sold as it is, without dissimulating its defects, and not to sell it above the price which it bears at the time of the contract; that he commits no injustice in selling it at this price, although he knows that the price must soon fall; that he is not obliged to disclose to the vendee a knowledge which he may have of the circumstances that may produce a depression of the price; the vendee having no more right to demand that the vendor should impart this knowledge than that he should give away his property; that if he should do it, it would be merely an act of benevolence, which we are not obliged to exercise except towards those who are in distress, which was not the case with the Rhodians, who were only in want of corn, but were not in want of money to buy it. The profit which the merchant makes in selling it for the price it is worth today, although he is conscious the price will fall to-morrow, is not iniquitous; it is a just recompense for his diligence in reaching the market first, and for the risk which he ran of losing upon his commodities if any accident had prevented his arriving so soon. It is no more forbidden to sell at the current price, without disclosing the circumstances which may cause it to fall, than it is to buy without communicating those which may cause it to rise. And Joseph was never accused of injustice for profiting of the knowledge which he alone had of the years of famine to buy the fifth part of the corn of the Egyptians without warning them of the years of famine that were to follow.
 'Notwithstanding these roasons and authorities, I should have some difficulty, in the forum of conscience, in excusing the injustice of a profit which the vendor might derive from concealing a fact which would cause a fall in the price of the commodity, when that fall must be very considerable, and must certainly arrive in a very short period of time, such as that which the merchant knew of the near approach of a fleet to Rhodes laden with corn. In the contract of sale, as well as in other mutually beneficial contracts, equity requires that what the one party gives should be the equivalent of what he receives, and that neither party should wish to profit at the expense of the other. But in the case of the merchant, who, by dissembling the knowledge which he has of this fact, sells his corn at one hundred livres the cask, the market price of the day, can he, without illusion, persuade himself that the article which, in two days, will be worth no more than twenty livres, is the equivalent of one hundred livres which he receives? You will say that it is sufficient if at the time it be worth the price of one hundred livres for which he sells it. I answer, that a thing, which has a present and momentary value of one hundred livres, but which he certainly knows will be reduced in two days to the value of twenty, cannot be seriously regarded by him as truly the equivalent of the money which he receives, and which must always be worth one hundred. Does not his conduct imply, that he wishes, by his reservation, to profit and enrich himself at the expense of the buyers, to induce them to purchase a commodity by which he is certain they must lose in two days four fifths of the original cost?'
 The merchant will smile at the rigid morality of this deservedly celebrated writer, who proceeds, in a fourth article, to consider whether the vendor may, in foro conscientia, sometimes sell at a price above the true value of the commodity. After laying down some general rules on this subject, he remarks, that 'they are not adopted in the civil forum, where a vendee is not ordinarily admitted to complain that he has purchased dearer than the true value, it being for the interest of commerce that parties should not be allowed to set aside their contracts with too much facility.' No. 242. In a subsequent part of his treatise he states what are the nature of the frauds that may be committed by the vendee, which he resolves into two classes. 1st. The first consists of any misrepresentation or circumvention which the vendee may employ in order to induce the vendor to sell, or to sell at a less price. 2d. Where the vendee conceals from the vendor the knowledge which he may have, touching the thing sold, and which the vendor may not possess. The former species of fraud, if sufficiently proved, he considers will invalidate the contract even in the civil forum. But the latter he deems only obligatory in foro conscientiae, both because unduly restricting the freedom of commerce, and because the vendor ought to know best the qualities of the articles he sells, and if he does not, it is his own fault. Nos. 294-298. In the fifth part, chap. 2., he considers the subject of the action which is given by the Code, l. 4. tit. 44. De rescind. vend., to the vendor for rescinding the contract on account of enormous lesion, or gross inadequacy of price, which, however, does not extend to merchandise, or other personal property, and, therefore, it is unnecessary to trouble the reader by extending this note to a greater length.