PETER A. H. JACKSON, Respondent, *against* FRANK M. ODELL, Appellant.

(Decided March 14th, 1884.)

Where the lessor of a dwelling house, in order to induce the lessee to accept the lease, makes to the lessee a material representation as to the condition of the house, which he knows to be false, and upon which, as he is advised at the time, the lessee means to rely, and the lessee, relying thereon, accepts the lease and enters upon the premises, but afterwards, upon discovering the fraud on the part of the lessor, and that, because of the bad condition of the plumbing work, contrary to the representation of the lessor, the house is permeated by offensive odors and sewer gas, making it unfit for human habitation, he, within a reasonable time, abandons the premises, an action by the lessor for rent subsequently accruing cannot be maintained.

A question upon conflicting evidence in such an action, as to whether the lessor, at the time of making such representation, knew that the house was not in the condition represented by him, is for the jury to determine.

APPEAL from a judgment of this court entered upon the verdict of a jury rendered by direction of the court.

The facts are stated in the opinion. A decision upon a former appeal in the same case is reported in 9 Daly 371, where the previous proceedings are stated. Upon the new trial directed by that decision, a verdict for plaintiff was directed by the court; and from the judgment entered thereupon defendant appealed.

*Benno Loewy*, for appellant.—Where the landlord knows that a cause exists which renders the house unfit for habitation, it is a wrongful act on his part to rent it without notice of its condition (*Wallace* v. *Lent*, 1 Daly 483; *Cesar* v. *Karutz*, 60 N. Y. 228; *Sequard* v. *Corse*, 9 N. Y. Week. Dig. 51; *Coke* v. *Gutkese*, 80 Ky. 598; *Crump* v. *Morell*, Phila. Com. Pl., cited in McAdam's Landlord and Tenant 2d ed. 501; *Minor* v. *Sharon*, 112 Mass. 477).

Plaintiff was guilty of a fraud in representing the demised premises to be in good order and in a tenantable con-

dition, while in truth and in fact they were not, and it is immaterial whether or not he knew them to be untenantable if he assumed and intended to convey the impression that he had actual knowledge of their condition, though he was conscious that he had no such knowledge (*Wakeman* v. *Dalley*, 51 N. Y. 27, 35; *Meyer* v. *Amidon*, 45 N. Y. 169; *Oberlander* v. *Spiess*, Id. 175; *Craig* v. *Ward*, 1 Abb. App. Dec. 454).

From the evidence in this case this question should have been submitted to the jury (Opinion of Van Hoesen, J., *Jackson* v. *Odell*, 9 Daly 378; *Hart* v. *Hudson River Bridge Co.*, 80 N. Y. 622; *Powell* v. *Powell*, 71 N. Y. 71, 73; *Healy* v. *Dry Dock &c. R. R. Co.*, 11 Rep'r 99; *Stackus* v. *New York Central &c. R. R. Co.*, 79 N. Y. 464).

*George J. Smith*, for respondent.—There was no question to submit to the jury. There was a failure to prove any representation by plaintiff as alleged in the answer, or that the representations he did make were untrue. Defendant failed to prove any knowledge in the plaintiff of the unhealthy or untenantable condition of the house, or of the existence of sewer gas in the house at the time of the hiring.

There was no competent testimony offered as to the damage. The measure of damage is the difference between the actual value and the value had the representations been true (*Wyeth* v. *Morris*, 13 Hun 338; *Graves* v. *Spier*, 58 Barb. 349; *Page* v. *Parker*, 40 N. H. 47; *Carr* v. *Moore*, 41 N. H. 131; *Fish* v. *Hatch*, 31 N. H. 535; *Myers* v. *Burns*, 35 N. Y. 269; *Hexter* v. *Knox*, 63 N. Y. 561; *Brooklyn* v. *Brooklyn City R. R. Co.*, 47 N. Y. 483; McAdam on Landlord and Tenant 449).

Defendant has waived the fraud (if there was any) and is estopped. The hiring took place in October, 1877; the alleged defects were found in November and December, 1877. The tenant still remained in possession until March, and paid his rent for February. It was the duty of the defendant to move out immediately or make the repairs himself, looking to the landlord for the expense (McAdam

on Landlord and Tenant 2d ed. 449; *Arnold* v. *Clark,* 45 Super. Ct. [13 Jones & Sp.] 245). Plaintiff was not bound to make repairs (*Howard* v. *Doolittle;* 3 Duer 464; *McGlashon* v. *Talmage,* 37 Barb. 313).

The case of *Wallace* v. *Lent* has no application to this case, because defendant alleges a representation and not a concealment, except to so far support the rule that the landlord must have knowledge of defect at the time of hiring.

CHALES P. DALY,. Chief Justice.—The lease in this case was for six months, from the first of November to the first of May following, the rent being paid monthly in advance.

The defendant complained, on the first of March, that the house was not tenantable. The plaintiff replied that if the rent was not paid by 12 M. that day he would take possession; the defendant answered, " You can have possession immediately," and left the premises.

The action is for rent for the month of March and April, being the residue of the term demised.

The defense was that the plaintiff represented the premises to be in good order, in a tenantable and healthy condition, and that the house was suitable for respectable people to occupy as a boarding house, whereas he knew that was not the fact; that the premises were unhealthy and untenantable, that the sewerage, drainage and plumbing work were out of order, and that he also knew that the house was not suitable for respectable people to occupy as a boarding house, as it was, to his knowledge, for a long period prior to the hiring of it by the defendant, occupied as a house of ill-fame by common prostitutes; and further, that the defendant, prior to abandoning the house, had been greatly annoyed and harassed by calls from persons who had been in the habit of visiting it when kept as a house of prostitution.

There was an additional allegation, by way of counterclaim, that the defendant hired the house for the purpose of keeping a boarding house, but from the causes above stated, it was not suitable for such a purpose, and that the defendant

could not, in consequence, secure and keep as many boarders as he otherwise would have been able to have done, to his damage, &c.

The defendant proved these facts; that a Mrs. Smyth, prior to the defendant hiring the house, occupied it for two years, until the first of May, 1877; that during that time the water closet in the basement leaked so that it could not be used; there was a hollow in the cellar from which the water oozed out, which was so offensive that the girl who bailed it out got sick; the furnace was in a bad condition; persons who boarded with Mrs. Smyth complained that the water closet was offensive; it sometimes bubbled up, and created a very bad smell; the condition in which the house was was told by her to the plaintiff, but he said he would do nothing, and would sue her if the rent was not paid; and, as she could get nothing done, she left the house in the following May, which remained unoccupied until the defendant hired it, six months afterwards, in November, 1877.

It further appeared that when Jackson, the plaintiff, showed the house to the defendant, Dr. Odell, he opened part of the shutters only. He opened the back window partly, and stepping into the front parlor, said, "it is a great deal of trouble to take down these bars and things; you can see about how it is;" and he turned the slats of one of the window blinds down; upon which the doctor remarked that the house was pretty dirty; and the plaintiff answered that it was nothing but what soap and water would remove; that the house had been unoccupied for a long time, and the dirt was the result of dust naturally accumulating in an unoccupied house; that it smelt musty, but that was because it had been shut up for some time. The defendant then asked the plaintiff if the house was in good repair and tenantable, and plaintiff said it was in good order except that it was dusty, and except the range in the kitchen, which he would have put in order. He invited the defendant to go up stairs, and the defendant replied that it was not necessary; that if he looked over the house he would

Jackson *v.* Odell.

know nothing about it, and that he would rather take the house upon the plaintiff's representation entirely. He gave the plaintiff his reason for not looking at the house specifically, which was his recent experience in the purchase of a house, which he was foolish enough to go over with the owner, at his request and with his assurance that it was in perfect order, and as he had seen the house he was responsible for a knowledge of the state it was in, and it afterwards cost him over $2,000 to put it in a tenantable condition; that he was not going to be caught again in that way; and as the plaintiff said it was in a good and tenantable condition, he would take his assertion for it, because he did not pretend to know. He says: "I told him distinctly it would be of no use for me to look at it, as I could not tell if I looked." And upon the plaintiff's statement, then, that the house was in good order, the lease was prepared and signed by the defendant.

The defendant testified that it was about the dirtiest house he ever got into; that the bath room was in a very bad condition; that the plaintiff painted the tub, but stopped on that; that there were smells emanating from the closet in the room where they slept, which was in the back parlor, in which there was a closet, a wash basin and a sink. Looking at it in gross, he says: "I found a stink—a fearful stink—which compelled me in all weathers to open the windows, at the risk of taking cold, rather than endure the smell." The nature of the smell, he says, was sewer gas, and he found a place in the cellar completely saturated with water, and, immediately under the sink, seven barrels that were full of water, and in another place in the cellar there was an oozing from the waste pipe leading to the sewer, which place he described as being "a perfect little privy." About a month after they had been in the house his wife began to complain about her health, and one of his children was taken unwell and afterwards the other children also. He testified that, in his judgment as a physician, the direct cause of the illness of his wife and children was the breathing of the vitiated air of the house, which vitiated air, he

said, was caused by dampness and sewer gas; that one of his boarders, a Mr. Calhoun, was taken with typho-malarial fever and died within a month or six weeks afterwards, the direct cause of whose illness, he testified, was nothing more than the sewer gas in the house, as he came to the house perfectly well, and was a man of as perfect habits as could be; that the defendant complained many times of the condition of the house to the plaintiff, but he did nothing—not even what he had said he would do.

Without going over this testimony further, it is sufficient to say that the evidence produced by the defendant was to the effect that the house was not in a proper condition for human habitation; that it was infected by sewer gas to an extent that made it dangerous to health and perilous to life. The obligation to repair was upon the defendant; that was the stipulation in the lease or in the one part of the agreement produced upon the trial by the plaintiff, though in the other part, which the defendant had been unable to find, he testified that that provision was stricken out because he objected to it. But even if that were so, the obligation would still be upon him to make ordinary repairs in the plumber's work or otherwise, as might be necessary to put the house in a condition that would make it fit to live in, unless he had the right to give it up, having been induced to take the lease by false and fraudulent representations made to him by the plaintiff as to its condition. There was, I think, enough in the evidence to require a submission of the case upon this point to the jury.

There was evidence showing that the plaintiff knew that it was not in a tenantable condition when the witness, Mrs. Smyth, who had previously occupied it, left it. It had remained vacant from that time until it was leased by the defendant, and when he went into possession, and it appears to have been in about the same state in this respect as when Mrs. Smyth occupied it, indicating that nothing in the meantime had been done to it.

Mrs. Smyth testified that she told the plaintiff about the cellar being in a bad condition and unhealthy; that the

water closet was bad and offensive and leaked into the cellar, and that her girl got a very bad sickness from it, the water closet being, as she said, her main complaint; that she called his attention to this leak and to the cesspool created by the leak directly from the water closet. She testified that this cesspool was visible to the eye; that it was covered with scum, and that the smell from it was of offensive matter from the water closet, and was complained of very much through the house; that she called the plaintiff's attention to it several times, but he never paid any attention to it, but, as she testified, was so unpleasant that she stopped sending any further complaints.

From this evidence it appeared that the plaintiff knew about the condition of the water closet; the leak from it to the cellar; the cesspool which was there, covered with scum and emitting an offensive smell, and so injurious that Mrs. Smyth's girl was made sick in taking out the water; in effect, that the house was permeated by some offensive odor that made it unhealthy and unfit for human habitation.

That it was permeated by sewer gas was proved by the testimony of several physicians, in addition to the testimony of Dr. Odell, the defendant. Professor Thomson, a medical professor in the University of the City of New York, who attended Calhoun, testified that he did not think that Calhoun, when he went to board at the house, had the malarial disease of which he died; that if he had brought the disease there with him, he, the professor, would have known it, as it would have been one of the elements of the case; that the presumption was that he contracted the disease in that house, and not elsewhere; and upon his cross-examination Professor Thomson testified: "I can positively say that I think he must have contracted it (the disease) there."

There was in this case the strong feature that the defendant advised the plaintiff, in hiring the house, that he had to rely entirely upon his statement as to its condition, because he had had a previous experience of his own incapacity to judge of the tenantable condition of a house, and that he

Jackson v. Odell.

had been put to $2,000 expenses thereby. When the defendant first asked the plaintiff whether the house was in good repair and tenantable, and the plaintiff answered that it was in good order, such a reply, if there was nothing more in the case, might be regarded as being made with the assumption that the defendant could examine the premises for himself, and as amounting to nothing more than mere general words of commendation. But after the defendant told him of past experience he had had of his incapacity to judge of the tenantable condition of a house, and for that reason that he preferred to take it upon the representation of the plaintiff, the plaintiff's deliberate reply, " Well, it is in good order, everything except the range, and that I will fix for you," was a much more serious and deliberate statement; as he thereby assumed to know—what the defendant did not—the condition in which the house was. He knew that the defendant was not to examine it, as he meant to rely solely upon the plaintiff's representation, and it was a statement, if the jury believed Mrs. Smyth and the defendant's witnesses, which was untrue, and known by him to be untrue. The evidence showed that the defendant, upon this false statement of the plaintiff, was induced to take a lease of the house for six months, which imposed upon him, by its terms, the obligation for so short a period of incurring a large expenditure for repairs in the plumbing work and otherwise to make the house tenantable and fit for human habitation.

The judge, at the close of the case and in directing the jury to find a verdict for the plaintiff for the amount of the rent, held that there was no evidence of any fraud established on the part of the plaintiff, or that he knew the house to be infected by sewer gas or unwholesome to live in. This was not, in my opinion, upon the evidence, a question for the court, but for the jury, as it was one upon which different minds might come to different conclusions. To illustrate which, I may say that the impression left. upon my mind by the perusal of the evidence is exactly the opposite of that of the judge who presided at the trial. It

is that the plaintiff made a material representation in respect to the condition of the house, which he knew to be untrue, upon which the defendant acted, and without which he would not have signed the lease. There is no implied warranty on the part of a landlord that a house is fit for occupation (*Jaffe* v. *Harteau*, 56 N. Y. 401; *Hart* v. *Windsor*, 12 Mees. & W. 68); and this being the rule, it has been held that a landlord is not even called upon, although he may know the fact, to disclose that the premises are in an unfit or dangerous state; for he has the right to assume that the tenant, before hiring, will make proper investigation and satisfy himself as to the condition of the premises (*Keates* v. *Cardigan*, 10 C. B. 591; *Hart* v. *Windsor*, *supra*); but a material representation by him to the tenant, which he knows to be false, as to the condition of the house, and upon which representation he is advised at the time the tenant for certain reasons means to rely, is quite another matter (*Keates* v. *Cardigan*, 10 C. B. 591; *Cornfoot* v. *Fowke*, 6 Mees. & W. 371, 373; *Valton* v. *Nat. Fund Life Assur. Co.*, 20 N. Y. 37).

There is a material distinction between passive concealment and active misconduct, such as a false representation in respect to some material fact that would necessarily, if relied upon, have some effect in inducing the other party to enter into the contract (*Doggett* v. *Emerson*, 3 Story 733; *Smith* v. *Countryman*, 30 N. Y. 680, 681; Bigelow on Fraud, 32).

Chief Justice MARSHALL, in *Laidlaw* v. *Organ* (2 Wheat. 178), whilst recognizing that a vendor is not bound to communicate extrinsic circumstances, which were exclusively within his knowledge, that might materially affect the price of the commodity, adds: "But, at the same time, each party must take care not to say or do anything to impose upon the other;" and this is the distinction here. Here there was a representation on the part of the plaintiff which, the evidence shows, was untrue, and, if the plaintiff knew it to be so, then the misrepresentation became material if it was a necessary inducement to the defendant's

making the contract; and whether in this respect it was material was a question for the jury and not for the court (Bigelow on Fraud, 7, 8, and cases there cited). If this were the fact, the defendant, upon ascertaining the fraud on the part of the plaintiff, might repudiate the contract; and if, after remaining there several months, paying rent, and repeatedly calling the plaintiff's attention to the condition of the house, he became at last thoroughly satisfied of the fraud practiced upon him by the plaintiff—that he would do nothing to repair the wrong he had done—and that the defendant, by continuing to live in the house, was imperilling the lives of himself and of his family—he was justified in quitting the premises, being, under such circumstances, under no obligation to expend a considerable sum of money for the repair of the house that he might remain there without peril to health or life (*Wallace* v. *Lent*, 1 Daly 481; *Arnold* v. *Clark*, 45 N. Y. Super. Ct. [13 Jones & S.] 255; *Cesar* v. *Karutz*, 60 N. Y. 228; *Powell* v. *Powell*, 71 N. Y. 73; *Hart* v. *Hudson River Bridge Co.*, 80 N. Y. 622; *Staples* v. *Anderson, supra; Cornfoot* v. *Fowke, supra; Smith* v. *Countryman, supra; Franke* v. *Youmans*, 30 Hun 83; see manuscript opinion of General Term, May, 1883).

In *Wallace* v. *Lent* (*supra*), where the landlord withheld from the tenant the fact of the existence of a deleterious stench in the house arising from an unknown cause, which rendered it dangerous to health to remain in it, and the tenant, being advised by his family physician that the health of himself and his family would be jeopardized by remaining there, he abandoned the premises, we held that where the landlord knows that a cause exists which renders the house unfit for occupation, it is a wrongful act on his part to rent it without notice of its condition; and if the tenant, after discovering and experiencing the injurious effects of the stench in the house, was compelled to quit it, the landlord could not take advantage of his own wrong by enforcing the contract for the payment of the rent.

If the plaintiff knew that the house was not in good

Jackson *v.* Odell.

order, and represented, as the evidence shows, to the defendant that it was, then the question whether he knew that the house was in the condition shown by the evidence was for the jury to determine, not for the court, there being sufficient in the evidence to warrant them in the conclusion that he knew all about it, and intentionally made a representation to the defendant which he knew to be untrue, to induce him to hire the house, and which had that effect, the defendant having no reliance on his own ability to determine by personal inspection whether the house was in good order or not.

For these reasons I think a new trial should be granted ; and in that connection it is proper to state that neither in the evidence given or offered was there anything which would entitle the defendant to quit the house upon the ground that before it was occupied by Mrs. Smyth and her son, two or three years before the defendant's occupancy, it was a residence for prostitutes, or anything to bring it within the cases of *Staples* v. *Anderson* (3 Rob't. 327) or *Cornfoot* v. *Fowke* (6 Mees. & W. 371, 373).

The judgment should be reversed and a new trial ordered ; costs to the appellant to abide the event.

LARREMORE and BEACH, JJ., concurred.

Judgment reversed and new trial ordered, with costs to appellant to abide event.