LAMAR, Appellant, vs. SCALES, Respondent.

*February 8 — February 28, 1888.*

*Contract: Sale of land: Evidence: Unauthorized offer by vendor's husband.*

The plaintiff's husband had offered to sell her interest in certain land to the defendant (her brother) for $4,000 if taken at once, but the defendant had refused to give more than $3,500.   The plaintiff denied

having authorized such offer, and there was no evidence to show that she even knew of it. Afterwards, having made a contract to sell at a large advance, the defendant obtained a quitclaim deed from the plaintiff, paying her $4,000. The plaintiff claims that when the deed was given the defendant further agreed to pay her whatever he should obtain above $4,000 for her interest. The defendant denies having made such agreement, and claims to have purchased her interest absolutely. It is *held* that, in determining what the terms of the sale were, the trial court gave undue weight to the previous unauthorized offer by the plaintiff's husband, and that, upon the evidence (stated in the opinion), the contract was as claimed by the plaintiff.

APPEAL from the Circuit Court for *La Fayette* County. The following statement of the case was prepared by Mr. Justice TAYLOR as a part of the opinion:

This action was brought by *Elizabeth Lamar* against *Frank Scales* to recover a part of the purchase price of certain real estate sold by her to him. The material facts alleged in the complaint, which were either proved or admitted on the trial, are the following: Samuel H. Scales, the father of the plaintiff and the defendant and four other children, died in September, 1877, leaving a widow, and among other real and personal property a deed of trust in 315 acres of land, situate south of Chicago and near the present city of Pullman, to secure a large sum of money. After his decease, the deed of trust was foreclosed, and the executors of the deceased bid in the property for the benefit of the six children and of the widow. The right of the widow was disputed, and it was afterwards adjudged that she took no interest in the said 315 acres of land, and that said land belonged to the six children as tenants in common, each owning one undivided one-sixth part thereof. [See *Hardy v. Scales*, 54 Wis. 452.] Before the claim of the widow to the land had been settled adversely to her, the plaintiff, on the 17th day of November, 1879, sold and conveyed her entire interest to the defendant, whether an

undivided sixth or an undivided seventh, as she alleges in her complaint, upon the following terms: "That said defendant, being desirous of acquiring the entire title to all of said tract in order that he might thereafter make a sale of the same, did, on or about November 17, 1879, procure from the plaintiff a deed of her entire share and portion of said property for and upon the consideration that, upon the sale of said property thereafter by him, he would pay to the plaintiff such a proportionate amount of the sum he should realize from the sale of all said property as it should be determined by the court thereafter that she was by law entitled to, and owned; and as a part payment of said consideration the defendant did then pay to this plaintiff the sum of $4,000 " The plaintiff further alleges that the defendant afterwards procured the title to the whole of said lands, and on or about the 23d day of January, 1880, sold and conveyed the whole thereof to one Amos Cotting for the sum of $60,000; that her proportionate share of said sum is $10,000; that the sum of $6,000 is still unpaid by the defendant; and that upon request he has refused to pay the said $6,000 or any part thereof, etc.

The answer denies each and every allegation of the complaint not therein expressly admitted, and then admits that Samuel H. Scales died, leaving a widow and the six heirs at law as set up in the complaint, and that he died seized of the notes and trust deed upon the lands described in the complaint; that the trust deed was foreclosed, and the land was bid in in the name of the widow and heirs at law of said deceased. And the defendant further admits "that he purchased the interest of the plaintiff in said real estate, but denies that he is indebted to the said plaintiff therefor in the sum of $6,000, or in any other sum, and denies that he is indebted to said plaintiff in any sum on any account."

The case was tried by the court without a jury. After hearing the evidence the learned circuit judge made twenty-

five findings of fact.  Nineteen of them are matters concerning which there is no dispute.  The following are the 20th, 21st, 22d, 23d, 24th, and 25th findings, which are the material ones to be considered upon this appeal, viz.: " (20) That the proof fails to establish the agreement set forth in the complaint; but, on the contrary, the preponderance of the proof is that all the defendant agreed to give the plaintiff for her interest in the land was the $4,000 which he paid her.   (21) I am led to this conclusion, notwithstanding the plaintiff and her son testify to such an agreement, that Hardy's testimony somewhat tends to sustain them, and that as against them the only oral testimony is that of the defendant, by the following considerations: (22) *Mrs. Lamar*, her son, and Mr. Hardy all testified from unaided memory as to what the defendant said more than six years ago.   All know that it is difficult to recall, even in substance, conversations after such length of time.   However, if this case had to be determined upon the recollection of the plaintiff and her two witnesses, and of the defendant alone, it would be my duty to find that the preponderance of evidence confirmed the agreement relied upon.   But there are certain uncontroverted facts that in this case stand prominently forth, and which have a controlling influence with me.   (23) The letters show beyond question that as late as November 6, 1879, the plaintiff was willing to sell her interest in the land for $4,000.   From that time to the execution of the quitclaim deed to the defendant, upon November 17, 1879, she had learned nothing to make her ask more for it.  When, therefore, upon that day, the defendant paid her $4,000 for her interest, there was no apparent reason why she should have been unsatisfied and have exacted, as further consideration, the agreement that if, when he sold the land, he got more than that for her interest, he would would pay the surplus to her.   If there had been such an agreement, would it not likely have been mentioned in the deed or ex-

pressed in some other writing? As far as she or her husband could see, the fulfilment of such an agreement would be for the indefinite future. It is not reasonable to suppose that, if such agreement was made, as prudent a man as his letters show Charles Lamar to have been would have been content to let it rest simply in memory. (24) The agreement claimed to have been made at the time the deed was executed was not such a one as a business man and a lawyer of the defendant's evident capacity would have wittingly made. It was his object to make money by buying *Mrs. Lamar's* interest. The agreement set up cuts him off from making anything. It was a one-sided agreement. All he got for her interest beyond $4,000 was to be paid to her, and if he realized less for it than that, she was under no obligation to pay back any part of the money he had paid to her. (25) There is no question of fraud in this case. This action is not based upon a claim of fraud for the concealment by the defendant from the plaintiff of the Cotting agreement. It is brought upon an alleged express contract, and upon that it must be determined. If it had been founded upon alleged fraud because of the failure to make known to the plaintiff the existence of that agreement before the execution of the deed, it is questionable whether, under the testimony, it would have been maintainable. There is no proof that the defendant did anything to mislead the plaintiff. She did not rely upon his judgment as to the value of the land, and it would seem, under the authorities, that he was under no legal obligation to inform her that he had entered into an agreement with Cotting to sell the land for $60,000."

As a conclusion of law the court found that the complaint should be dismissed upon the merits with costs. From the judgment entered accordingly the plaintiff appealed.

Lamar vs. Scales.

For the appellant there was a brief by *Orton & Osborn*, and oral argument by *Mr. P. A. Orton.*

For the respondent there was a brief by *T. J. Law* and *W. E. Carter*, and oral argument by *Mr. Carter.*

TAYLOR, J.   The learned judge, in the twenty-second finding, states it as his opinion that if the question of contract or no contract is to be determined by the evidence of what was done and said at the time the deed was executed and when the contract was in fact made, the preponderance of the evidence confirms the agreement as claimed by the plaintiff.   Upon this question there does not seem any reasonable doubt.   The plaintiff and her son, an intelligent young man, testify very clearly to the agreement as set up in the plaintiff's complaint, and their evidence is confirmed by the evidence of the brother-in-law of the defendant, Mr. Hardy.   In opposition to this evidence there is nothing except the general denials of the defendant, and his contention that he had no conversation with the plaintiff, at the time of the purchase, as to the price he was to pay or as to any other matter relating to the sale; but that the transaction was in fact between him and the plaintiff's husband. And when they had concluded the trade she signed the deed presented by her husband, and then asked him, "Now, *Frank*, what are you going to do with that land?" and that Mr. Lamar replied, "Why he is going to make money out of it if he can; we have sold it;" and to that remark of the husband she made no reply.   If defendant's version of what took place be the true one, it certainly shows a great want of interest on the part of *Mrs. Lamar* in a business in which she would naturally have the greatest interest.

The learned circuit judge was, as he says, influenced in arriving at the conclusion he did from the fact that certain

negotiations were had in regard to the sale of this land be-
tween the plaintiff's husband and the defendant previous to
the day when the transaction was finally completed.   In
our view of the previous transactions shown in the evidence
they do not, we think, tend to disprove the claim made by
the plaintiff as to what in fact took place at the time the
sale was made.   It is said that the correspondence shows
that the plaintiff was willing to sell her interest in the land,
unqualifiedly, for the sum of $4,000.   If any force is to be
given to the correspondence as against the plaintiff, it ought
to appear from the evidence that *Mrs. Lamar* knew what
the correspondence was, or that she had directed the corre-
spondence.   All the correspondence there ever had been was
between her husband and the defendant.    To make this cor-
respondence weigh against *Mrs. Lamar* it should appear
that she expressly authorized it, or, if not, that she knew
what it was, and so impliedly, at least, authorized it.   Upon
this point the plaintiff testified "that her husband, Charles
H. Lamar, was present and took part in the conversation at
the time the sale was made, and that he had not previous to
that time done any business in regard to this Chicago land.
There was a letter or two passed between my husband and
a Mr. Potwin, a real-estate man in Chicago.   I think there
were no negotiations for sale with Mr. Potwin.   We in-
quired of him its value.   He made no offer for the land that
I know of."   Again she says, "I was not aware that my
husband was corresponding with *Frank* [the respondent] as
well as Potwin about this land."   Again she testifies, after
the letters had been received in evidence: "I have read the
letters in evidence purporting to have been written by my
husband, and the letters written by *Frank*, the defendant,
also in evidence.   I had no knowledge that my husband·
wrote those letters, or either of them, when they were writ-
ten, nor did I ever know of his ever receiving any of the
letters from *Frank* which were in evidence.   .   .   .   I

never heard, until this trial, anything of *Frank's* letter to Mr. Lamar of the 14th of November, 1879, saying he accepted our offer to sell." "I knew nothing of the existence of any of these letters from Mr. Lamar to *Frank* until the last year in Chicago. I don't remember but one presented to me then. I did not read that. To-day is the first I have known of the contents of either of these letters written by my husband." The son of the plaintiff testified "that on the day the deed for the land was made no allusion was made to any correspondence between *Scales* and father or mother respecting the land in question." There is no evidence in the case tending to show that *Mrs. Lamar* ever authorized her husband to negotiate for a sale of this land on her behalf, except so far as he took part in the negotiations at the time the sale was actually made.

Upon this state of the evidence it is very doubtful whether the letters were competent evidence against the plaintiff, had they been objected to by her, and, having been given in evidence without objection, they should have no influence in determining the question at issue when it clearly appears that she neither authorized the correspondence nor was aware of its nature. The evidence in this case to bind the plaintiff by the acts and correspondence of her husband is no stronger, if as strong as in the case of *Hadfield v. Skelton,* 69 Wis. 460, where it was held that the wife was not bound by the acts of the husband done in her behalf but without her knowledge.

But if this court had the right to consider this correspondence between the husband of the plaintiff and the defendant for the purpose of determining the question as to what the contract of sale was, we do not think they should destroy the case as made by the evidence as to what took place at the day the trade was actually consummated. The facts are that at the time of the sale plaintiff was one of the tenants in common of the land in question, with

her brother *Frank* and the other sisters and brother, and, it was claimed by the defendant, with her mother; that *Frank* was a lawyer, and lived in Chicago, near where the land was situated, and could look after the land better than the plaintiff, who was living in the state of Iowa. She had given him a power of attorney in October, 1878, authorizing him to make leases and collect the rents to become due on such land, and to institute suits necessary to perfect the title to said land, and to do all and every act necessary to be done about said premises, etc. There was no power of sale given in this writing. The correspondence opens between the defendant and the husband of the plaintiff by a letter from defendant to Mr. Lamar, dated October 1, 1879, in which he inquires whether he would like to put his interest in the market at $75 per acre. To this a reply was made, October 5th, by Mr. Lamar, saying that he did not know what it was worth, and asking if the other owners would be willing to sell at that price, and intimating that they would trade their interest for a stock of merchandise. To this the defendant replied, October 14, 1879, saying he did not want to advise about the land, but said he thought *he could get* $3,500 for their interest. To this Mr. Lamar replied, October 31, 1879, in which he says he had delayed answering until he had received a letter from Mr. Potwin, who was anxious to buy for some parties in Chicago, and saying he would give $3,500 for their interest. "I said you had offered us that, and if I sold for that you should have the refusal," and then saying he thought it was worth more, and would not take less than $4,000 cash down. In this letter he also stated that Hardy, his brother-in-law, said the property was worth $150 per acre, and that some real-estate men said it was worth $200 per acre, but said they were not waiting for such prices, and if they could get $4,000 down, he could invest it in cattle and make it pay better, and closed with requesting an early answer, as

they wished to close the trade soon with some one if they could. To this the defendant replied November 3, 1879, saying he could not give more than $3,500 for their interest; referred to the taxes on the land, amounting to $800, and after referring to the offer of Potwin he closes by requesting an early reply if they would take $3,500 cash down. To this Lamar replied November 6, 1879, as follows: "Yours of 3d received, and in reply would say we have made up our minds not to sell for $3,500 at present. Will not take less than $4,000, as I wrote you, and do not consider that a standing offer; but if you want it for that at the present time let me know at once, and make out a quitclaim deed and send it to me, and we will sign it and close the matters up. And if you don't want it let me know at once, as I told other parties you had the refusal. I have no doubt it will be worth a great deal more in a year, and we will try and work on without it. As for the taxes, they are large, but I suppose the rent is something; and as for the suit, it is a cloud, but one, from what you told me, is but a small affair. At all events, if I don't sell, I will chance it." To this the defendant made the following reply: "DEAR UNCLE: I have your letter at hand, and want to say that I did not mention the taxes and suit to influence you or *Lizzie* to make the sale, but only to show that a stranger buying would have to have all these matters arranged, and that would take time. I do not think the tax suit amounts to anything. But it costs something; that is all. I shall send you a copy of my argument in the case in a few days. Now, I would like to pay you the amount you ask if I could. Potwin came to see me, and I made up my mind that he wanted to get the selling of the land. Now, I can make a sale as good as anybody. I told him that I had written you that I would give you $3,500 for your interest; that I would not give any more; and I have no doubt he intended to help me get the interest you had,

and then thought he might make a sale for me. You know how such things are. If you do not choose to sell for the figures named I shall try to get all I can for you."

These two letters seemed to have closed the correspondence. Lamar had made a final offer at $4,000,— not a standing offer,— and requested a speedy answer. The answer came and the proposition was declined when the defendant wrote the letter of November 10, 1879, declining the offer to purchase at $4,000. Admitting that Lamar had authority from his wife to make the offer, the offer was no longer binding on her, and had it been accepted after the receipt of the letter of November 10th, it is clear the plaintiff would not have been compelled to convey for the $4,000.

It will be noticed that in this letter of the 10th of November the defendant suggests, at least, if he does not expressly request, that they should not put the lands in the hands of any one else for sale. He knew from the correspondence that Lamar had been making inquiries from other parties about the value of the land, and had reason to suppose that after he had refused the final offer they might seek a sale through some other person. So he says: "I can make a sale as good as anybody." "If you do not choose to sell for the figures named I shall try and get all I can for you." Three days after this letter was written, the defendant makes a contract with a responsible party for the absolute conveyance of five sevenths of the land at the rate of $60,000 for the whole interest, and receives $5,000 down in part payment of the five sevenths; $20,000 to be paid in five days after abstract of title to said premises, written down to date, showing said title to be satisfactory in the defendant for five sevenths of said land. This abstract of title was to be furnished within twenty days after the date of contract, and on payment of the $20,000 a warranty deed was to be executed for the five sevenths,

and the balance for the five sevenths, viz., $17,857.17, was to be then paid. The balance of the $60,000 was to be paid as soon as the title to the other two sevenths was furnished. The proof shows that this sale was perfected by the defendant, and the title to the whole tract was conveyed to said purchaser, and the consideration of $60,000 was paid to the defendant, less the sum of $10,500 which was paid to Mrs. Hardy for her one-sixth interest in the same, so that for the five-sixths interest which the defendant had acquired he received from said Cotting the sum of $49,500. On the 14th day of November, after making the trade with Cotting, the defendant wrote the following letter to Mr. Lamar: "DEAR UNCLE: Since writing you I have concluded to accept your offer to sell lands here, and inclose deed, which you and *Lizzie* acknowledge before a notary and send to me, and I will send you draft for $4,000. What I would like to do would be to assume the two $500 notes that Sam. holds, and pay you the difference. That would prevent me borrowing so much money. The amount due on the notes, with interest up to the 20th of this month, is, as Sam. writes me, $1,133.33. That would leave a balance of $2,866.67. If you wish to do this it will accommodate me. If not, I will send you the $4,000. I would not like to have you sell to anybody else." On the same day he started for the home of Mr. Lamar, in Iowa, where he completed the trade. There is no evidence that this letter of the 14th of November was ever received by either Lamar or the plaintiff.

The foregoing facts are stated, not for the purpose of showing that the defendant had assumed a fiduciary relation to the plaintiff in regard to this land, so that in equity he would be held liable to account to her for the money received by him on the contract of sale of her one-sixth interest to Cotting, but for the purpose of showing that when this sale to Cotting was made, and when the plaintiff sold her interest to the defendant, the negotiation for sale

with her husband had been closed, and there was no standing offer ever made on his part to sell the land for $4,000; and also for the purpose of showing that the relation of the defendant to this land and to the plaintiff had radically changed since he had refused to pay more than $3,500 for her interest, and that when he appeared at the plaintiff's residence in Iowa to make the purchase he was in a position to make almost any reasonable concession to his sister in order to procure her interest in the land, so as to enable him to complete the sale to Cotting and reap the benefits thereof. That in his contract to make a good title to Cotting of the five sevenths within twenty days, he contemplated that, as a part of said five sevenths, he must obtain the title of the plaintiff to what he supposed was her one seventh, is evident. He had, as the evidence shows, claimed that his mother was entitled to one seventh, his sister, Mrs. Hardy, was entitled to another seventh, and it would seem he had become the owner of the other four sevenths. He knew he could not purchase of Mrs. Hardy, except at a very large price. His only way to furnish the required title to five sevenths was to buy the interest of the plaintiff. The mother's title was disputed, and he could not make a satisfactory title from her. Mrs. Hardy was standing out for a large price, full as much as he sold for. So it is fair to presume that his contract to sell the five sevenths was intended to include the interest of the plaintiff. No injustice is done to either party by holding that the contract made was as is claimed by the plaintiff; whereas, to hold that the contract was as claimed by the defendant, would be, *in foro conscientiæ* if not in law, a fraud upon her. Considering the changed situation of the defendant at the time the sale was actually made, and the fact that there is no evidence in the case showing that the plaintiff either directed the correspondence between her husband and the defendant, or that she had any knowledge of the

character of such correspondence, we think the learned circuit judge gave undue weight to it, in determining the question as to what the terms of the sale in fact were. It being found by the learned circuit judge that if the case must be decided upon the evidence as to what took place at the time the sale was in fact made, it should be decided in favor of the plaintiff, we do not think that the apparently unauthorized negotiations of her husband with the defendant ought to have any influence in changing the result, especially in view of the changed situation of the defendant after such negotiations had ended.

The learned judge says there is no question of fraud in the case, as the action is brought upon an alleged express contract. This is true, and we determine to reverse the decision of the learned judge on the ground that the evidence establishes such express contract. We have, however, very grave doubts, upon all the facts of the case, whether the relation of the defendant to the plaintiff, and his conduct in procuring her conveyance for this land, would not have been set aside by a court of equity upon proper pleading, if he had in fact procured from her a deed of such land for the consideration of $4,000; or, if the plaintiff did not wish to avoid the sale, would have held the defendant to account to her for the entire consideration received by him on such sale for her interest. See *Laidlaw v. Organ*, 2 Wheat. 178, 195; *Bench v. Sheldon*, 14 Barb. 66, 74; *Turner v. Harvey*, Jac. 178. These cases illustrate the strict rule applied by courts to cases of this character.

The evidence shows that in order to complete the sale for the $60,000 the defendant was compelled to pay his sister, Mrs. Hardy, the sum of $10,500 for her share. This sum, deducted from the $60,000, would leave $49,500 as the amount he received for the other five sixths. One fifth of this amount would be what the plaintiff would be entitled to recover for her interest, viz., $9,900. Of this she has

received $4,000, leaving unpaid $5,900, and for this amount, less her proportionate share of any taxes and other necessary disbursements made by the defendant in making the title good to said land, the plaintiff is entitled to judgment, with interest at the rate prescribed by the laws of Iowa from the 1st of March, 1880, that being the date fixed by the court at which the sale to Cotting was completed and the consideration finally paid.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remitted to that court to take such further proceedings as may be necessary to ascertain the amount due the plaintiff according to this opinion, and to enter judgment therefor as directed therein.